## IN RE: Matthew Edward AUTTERSON, Debtor.

### Bankruptcy Case No: 13–30184 TBM

United States Bankruptcy Court, D. Colorado.

Signed February 26, 2016

---

Garry R. Appel, Peter J. Lucas, Denver, CO, for Debtor.

## ORDER DENYING CONFIRMATION OF COMPETING CHAPTER 11 PLANS AND DISMISSING CASE

Honorable Thomas B. McNamara,
United States Bankruptcy Judge

### I. *Introduction*

This case presents the paradox of a seemingly wealthy but bankrupt debtor. A well-educated former senior executive in the financial services industry, the Debtor, Matthew Edward Autterson (the "Debtor"), amassed substantial wealth over his 30–year career. As he exited day-to-day corporate management responsibilities and sold his principal business enterprise, he focused on tax and estate planning issues. In 2001, he created a family partnership as well as family trusts. The Debtor, as sole general partner, majority limited partner, and sole managing partner, controlled his family partnership for more than a decade and used it for his own personal benefit. The family partnership and a family trust "loaned" the Debtor substantial funds (in excess of $4.6 million) with little regard to his capacity or intent to repay. Meanwhile, the Debtor received well over $8 million in wages and other income for the period from 2005–2013.

But the Debtor's careful financial planning hit a serious bump. On November 25, 2013, a Colorado state court entered a judgment in the amount of $2,621,117 (plus post-judgment interest) against the Debtor and in favor of First Citizens Bank & Trust Co. (the "Bank") pursuant to a guaranty obligation. Rather than pay the

Bank from his own assets or his majority interest in his family partnership, the day after the entry of the judgment, the Debtor and the family trusts changed the management of his family partnership so that the Debtor was no longer the sole general partner and ostensibly no longer controlled the family partnership. Then, a few days later, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code. His only true third-party creditor is the Bank. His family partnership, a family trust, and the Debtor's legal counsel round out the remaining group of creditors with claims of about $4 million, $600,000 and $10,000, respectively. There is no one else with any economic interest in this case.

Over the last two years, the Debtor (along with his family partnership and family trusts) and the Bank have been engaged in internecine litigation warfare in the Bankruptcy Court. Meanwhile, the Debtor has maintained what appears to be a fairly lavish lifestyle. Recently, the Debtor submitted a Fourth Amended Plan of Reorganization. As it relates to the Bank (and his family partnership and a family trust), the Debtor projected that the proposal would result in payment of approximately 26% of allowed claims from the Debtor's current liquid assets. In addition, the Debtor proposed that a liquidating trustee auction his restricted interest in the family partnership (which itself continues to have very substantial assets). The Debtor acknowledged that the auction might net nothing (but possibly more). According to the Debtor, the net result is unknown—after all, who would be interested in bidding for a now non-controlling interest in his family partnership? If the proposed auction generates nothing, the Bank would be out of luck and only receive the Debtor's cash on hand even though the family partnership (in which the Debtor is the majority limited partner) has very valuable assets. Not surprisingly, the

Bank contested that approach. The Bank proposed its own competing Plan of Reorganization which would result in the Bank receiving a much higher return for itself. But the Bank's proposal would effectively leave the legitimate claims of the family partnership and family trust unsatisfied (except through a proposed accounting gimmick with no dollars actually paid).

The present quandary and four days of trial testimony leave the Court with a series of difficult questions that implicate numerous Chapter 11 issues such as proper classification of claims, impairment of claims, plan acceptance, gerrymandering, good faith, and feasibility:

• Does the Debtor's Fourth Amended Plan of Reorganization satisfy the requirements for Chapter 11 confirmation under the Bankruptcy Code?

• Does the Bank's Amended Plan of Reorganization satisfy the requirements for Chapter 11 confirmation under the Bankruptcy Code?

• If both the Debtor's Fourth Amended Plan of Reorganization and the Bank's Amended Plan of Reorganization are confirmable, which is preferable since the Court can only confirm one Chapter 11 plan?

• If neither the Debtor's Fourth Amended Plan of Reorganization nor the Bank's Amended Plan of Reorganization is confirmable, then should the case be converted to Chapter 7 liquidation, dismissed, or remain in Chapter 11 limbo (with or without a Chapter 11 trustee)?

## II. *Jurisdiction*

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (L) and (O) in that the matter concerns Chapter 11 plan confirmation as well as other bankruptcy remedies

such as conversion to Chapter 7 liquidation, appointment of a Chapter 11 trustee, and dismissal. The Court may enter a final order or judgment on such matters. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### III. *Procedural Background*

The Debtor filed a Petition for protection under Chapter 11 of the Bankruptcy Code on December 9, 2013. (Docket No. 1.) Since that time, the case has remained in Chapter 11 with the Debtor acting as debtor-in-possession. The following are the significant post-petition procedural developments that frame the confirmation questions:

A. *Early Plans and Determination of the Amount of the Claims of the GL3B Entities.*

In this case, a key procedural predicate to potential reorganization was early determination of two contested claims. In his initial Statement of Financial Affairs and Schedules, the Debtor asserted that he owed two insider entities substantial amounts for loans. (Debtor's Exhibit No. 2.) Specifically, he claimed that he owed $5,850,000 to GL3B Partners Limited, L.P. (the "GL3B Partnership"). *Id.* He also asserted that he owed $933,393 to GL3B Trust II (the "GL3B Trust II"). *Id.* Together, GL3B Partnership and GL3B Trust II are sometimes hereinafter referred to as the "GL3B Entities." The Debtor himself created and controlled the GL3B Entities until shortly before the bankruptcy filing (and perhaps thereafter as well). He is a general partner, majority limited partner, and sole managing partner of the GL3B Partnership.

Although the factual background concerning the Debtor's creation and control of the GL3B Entities (and his action to cede control of the GL3B Partnership right before the bankruptcy filing) is key to some of the confirmation issues and will be discussed in more detail as part of the Court's Factual Findings, suffice it to say that fairly early in the case the Bank raised concerns over the insider debts and the role of the GL3B Entities.

The issues initially surfaced in the context of the Debtor's first "Plan of Reorganization." (Docket No. 50, the "Debtor's Initial Plan"). The Debtor's Initial Plan grouped the scheduled unsecured claims of the GL3B Partnership ($5,850,000) and the GL3B Trust II ($933,393) along with the Bank's debt ($2,629,160) into a single class. The Debtor proposed to pay such claims approximately 33% over 7 years. With only three claims in the common class, it was apparent that the insider claims of the GL3B Partnership and the GL3B Entities would control the class. The Bank objected to such treatment in the plan disclosure process. (Docket No. 74.) The Debtor responded with another proposed plan which drew similar disclosure objections from the Bank. (Docket Nos. 85, 86 and 88.)

Given the impasse, the Bank objected to the scheduled claims of the GL3B Entities in their entirety. (Docket Nos. 107 and 136.) Because of the size of the claims of the GL3B Entities, and the effect that the allowance or disallowance of such claims would have on the reorganization process, the Court elected to adjudicate the claims of the GL3B Entities before conducting a confirmation hearing. After the conclusion of a two-day evidentiary hearing, the Court entered Judgment (the "Claims Judgment") determining that the claims of the GL3B Entities would be allowed but in lower amounts than originally scheduled. (Docket Nos. 195, 197, 198 and 215.) More specifically, the Court allowed the claim of the GL3B Partnership in the reduced amount of $4,006,176 (the "GL3B Partnership Claim") and allowed the claim of the

GL3B Trust II in the reduced amount of $597,074 (the "GL3B Trust II Claim").[1] *Id.* For ease of reference, the GL3B Partnership Claim and the GL3B Trust II Claim are sometimes hereinafter referred to as the "GL3B Claims." Notwithstanding the allowance of the GL3B Claims (in reduced amounts), the Court recognized that the Debtor had improperly inflated the GL3B Claims in an attempt to obtain a strategic advantage in the bankruptcy case. (Docket No. 215, Trans. Nov. 14, 2014 Ruling at 16).

The GL3B Entities both appealed the Claims Judgment and instead sought allowance in full as originally scheduled. (Docket Nos. 207 and 209.) On November

1. The Bank:
2. GL3B Partnership
3. GL3B Trust II
4. Sherman & Howard

The Bank filed Claim No. 6–1 in the amount of $2,629,160 (the "Bank Claim"). The basis of the Bank Claim is a Guaranty Agreement pursuant to which the Debtor guaranteed (in an amount not to exceed $3 million) an $11.25 million loan to Communicom Corporation of America, LLC and related entities. The Bank filed suit on the Guaranty Agreement. On November 25, 2013, the District Court for the City and County of Denver, Colorado issued an "Order, Judgment, and Certification Pur-

6, 2015, the United States Bankruptcy Appellate Panel for the Tenth Circuit affirmed the Claims Judgment. *See GL3B Trust II v. First Citizens Bank & Trust Co. (In re Autterson)*, 2015 WL 6789168 (10th Cir. BAP Nov. 6, 2015) (unpublished) (hereinafter, the "BAP Decision"). As no further appeals were prosecuted, the amount of the GL3B Claims has been resolved definitively by adjudication.

## B. The Remaining Creditors.

One of the unique features of this case is a very small group of remaining creditors—all can be counted on a single hand.[2] The Debtor owes:

$ 2,629,160 (plus post-judgment interest)
$ 4,006,176
$ 597,074
$ 10,000

suant to C.R.C.P. 54(b)" (the "Bank Judgment") in favor of the Bank and against the Debtor in the amount of $2,621,117 plus post-judgment interest at the statutory rate. (Bank's Exhibit 14.) The Bank Claim is slightly higher than the principal amount of the Bank Judgment since it included interest accrued through December 9, 2013. The Bank also claimed post-petition interest, attorneys' fees and costs in the Bank Claim. No party has objected to the Bank Claim.

---

1. All subsequent references in this Order to the GL3B Partnership Claim and the GL3B Trust II Claim are to the reduced amounts actually determined and allowed in the Claims Judgment (not as originally scheduled in the Debtor's Statement of Financial Affairs and Schedules).

2. In his initial Statement of Financial Affairs and Schedules (Debtor's Exhibit No. 2), the Debtor listed a residence valued at $4.2 million encumbered by a $2.3 million mortgage to JP Morgan Chase and a real property tax obligation owed to Arapahoe County, Colorado. The residence was sold pursuant to

Court Order under Section 363(b). (Docket No. 279.) The sale proceeds were used to pay JP Morgan Chase and Arapahoe County, Colorado while the Debtor retained the balance in a debtor-in-possession account. Thereafter, the family partnership bought a residence which the Debtor now uses. Further, the Debtor also listed nominal amounts owed to AT & T, Xcel Energy, Comcast, Denver Water, and Progressive Insurance. In contravention of the Bankruptcy Code, the Debtor paid such pre-petition debts in full during the early stages of the case. Accordingly, such claims are not pending.

With respect to the GL3B Claims, they arise from loans extended by the GL3B Entities to the Debtor to fund his personal expenses. *See* BAP Decision, 2015 WL 6789168 at *1–4. As discussed above, the Bank objected to the GL3B Claims. After a hard-fought trial, the Court allowed the GL3B Claims in reduced amounts. Accordingly, the GL3B Claims are finally determined, allowed, and "legitimate unsecured debts" of the Debtor. *Id.* at *1.

In the Debtor's Statement of Financial Affairs and Schedules, the Debtor scheduled an undisputed debt owed to Sherman & Howard of $10,000 for "attorney fees" rendered for pre-petition services (the "Sherman & Howard Claim"). (Debtor's Exhibit 2.) No party has objected to the Sherman & Howard Claim.

### C. *The Debtor's Fourth Plan.*

On December 7, 2015 (literally the eve of the contested confirmation hearing), the Debtor filed his "Fourth Amended Plan of Reorganization." (Docket No. 400, the "Debtor's Fourth Plan.") As the name suggests, the Debtor's Fourth Plan was the final iteration in a sequence of prior unsuccessful Chapter 11 plans submitted during the last two years. Prior to the last-minute submission of the Debtor's Fourth Amended Plan, the main focus had been the Debtor's "Third Amended Plan of Re-

organization." (Docket No. 334, the "Debtor's Third Plan.") The Debtor's approved "Disclosure Statement" related to the Debtor's Third Plan. (Bank's Exhibit 32.) Further, the Debtor solicited votes on the Debtor's Third Plan. (Bank's Exhibit 70.) And the sole objection to confirmation was to the Debtor's Third Amended Plan. (Docket No. 345.)

The changes between the Debtor's Third Plan and the Debtor's Fourth Plan were primarily in the nature of clarification and not material for purposes of confirmation. Accordingly, the Debtor, the GL3B Entities, and the Bank all agreed to proceed with a contested confirmation hearing based on the Debtor's Fourth Plan, but relying on the Disclosure Statement and balloting for the Debtor's Third Plan as well as all related submissions. The Court concurred with such approach. *See* 11 U.S.C. § 1127(a) ("proponent of a plan may modify such plan at any time before confirmation").[3]

### D. *The Bank's Plan.*

Another feature that makes this individual Chapter 11 case somewhat unusual is a competing plan of reorganization. On August 26, 2015, the Bank filed its "Amended Plan of Reorganization Dated May 7, 2015."[4] (Bank's Exhibit 33, the "Bank's

---

**3.** With respect to the Debtor's Fourth Plan, the Court considered:

- The Debtor's "Disclosure Statement for Third Amended Debtor's Chapter 11 Plan of Reorganization dated August 26, 2015" (Bank's Exhibit 32, the "Debtor's Disclosure Statement");
- The Debtor's "Confirmation Trial Brief" (Docket No. 374);
- The GL3B Entities' "Plan Confirmation Trial Brief" (Docket No. 373);
- The Bank's "Objection to Debtor's Third Amended Plan of Reorganization" (Docket No. 345);

- The Bank's "Brief in Support of Objection to Debtor's Plan of Reorganization" (Docket No. 375);
- The GL3B Entities' "Response to First–Citizens Bank & Trust Company's Brief in Support of Objection to Debtor's Plan of Reorganization" (Docket No. 390);
- Debtor's "Response Trial Brief" (Docket No. 392); and
- Debtor's "Ballot Report" (Bank's Exhibit 70).

**4.** The date used in the title of the Bank's Plan is a little confusing in that it appears based upon a prior iteration of a plan of reorganization. (Docket No. 288.) Somehow, the May

Plan.")[5]

### E. The Motion to Convert, Dismiss or Appoint Chapter 11 Trustee.

To complicate things just bit further, another issue beyond confirmation of the Debtor's Fourth Plan or the Bank's Plan is at play. More than a year ago, the Bank filed a "Motion to Convert to Chapter 7 or in the Alternative for Appointment of Trustee." (Docket No. 229, the "Motion to Convert.") Both the Debtor and the GL3B Entities objected to the Motion to Convert. (Docket Nos. 242 and 244.) Thereafter, the Court (at the request of the parties) held the Motion to Convert in abeyance pending determination of the claims of the GL3B Entities and consolidation with confirmation issues. (Docket No. 269.)

After the Debtor's Third Plan and the Bank's Plan were filed, the Bank orally confirmed its intention to pursue the Motion to Convert and also requested dismissal as potential alternative relief. (Docket No. 379, Trans. Aug. 13, 2015 Hearing at 52–53.) Counsel for the Debtor orally conceded that dismissal could be considered. Id. Thereafter, the Bank filed an "Amended Motion to Convert to Chapter 7 or in the Alternative for Appointment of Trustee" specifically requesting dismissal as a remedy. (Docket No. 396, the "Amended Motion to Convert.") The parties have agreed that the Amended Motion to Convert is at issue, including the options of conversion to Chapter 7 liquidation, appointment of a Chapter 11 trustee, or dismissal.

### F. The Confirmation Hearing.

The Court conducted a contested confirmation hearing on December 9, 10, 11 and 14, 2015 (the "Confirmation Hearing"). The Confirmation Hearing was consolidated to cover: (1) the Debtor's Fourth Plan and objections; (2) the Bank's Plan and objections; and (3) the Amended Motion to Convert and objections. The Court received testimony from the Debtor, Cody Autterson (the Debtor's son), Gerard Gilmore (a Bank officer), and Mark Autterson (the Debtor's brother). The Court also admitted voluminous exhibits. (Docket No. 407.) Further, counsel for the Debtor, the GL3B Entities, and the Bank all presented opening statements and closing arguments in support of their respective positions.

### IV. Factual Findings

The following factual findings are based upon the admissible evidence at the Confirmation Hearing (including both testimony and exhibits) as well as the public record admissions in the case, the Claims Judgment, and the BAP Decision:

### A. The Debtor.

The Debtor is a sophisticated businessman. He graduated from Michigan State University in 1979 with a degree in fi-

---

7, 2015 date carried over to the Bank's Plan even though it was actually filed on August 26, 2015.

5. With respect to the Bank's Plan, the Court considered:
- The Bank's "Amended Disclosure Statement for Chapter 11 Plan of Reorganization Dated May 7, 2015" (Bank's Exhibit 34);
- The Debtor's "Objection to First–Citizens Bank and Trust Company's Amended Plan of Reorganization" (Docket No. 342);
- The GL3B Entities' "Objection to Amended Plan of Reorganization Dated May 7, 2015 Proposed by First–Citizen's Bank & Trust Company" (Docket No. 343);
- The Bank's "Responsive Legal Brief in Support if its Amended Plan of Reorganization and in Opposition to Debtor's Third Amended Plan of Reorganization" (Docket No. 388); and
- The Bank's "Ballot Report" (Bank's Exhibit 69).

nance. Shortly thereafter, he moved to Colorado and began his career in the financial services industry with First Trust Corporation, a Colorado state chartered trust company. After a few years, the Debtor and certain of his colleagues formed a new Colorado state chartered trust company: Resource Trust Company. In 1986, the Debtor became the president of Resource Trust Company. He ran the company for about the next fifteen years. Resource Trust Company was a very successful enterprise. According to the Debtor's Disclosure Statement, Resource Trust Company:

> ... provided custodial services for retirement plan assets sold by more than 10,000 independent financial planners to their clients .... The company employed more than 500 people, had $20 billion in custodial assets and was the largest state chartered financial institution in Colorado with more than $1 billion in insured assets.

(Bank's Exhibit 32 at 5.) During the Debtor's tenure, Resource Trust Company changed ownership a few times. *Id.* In 2000, AIG (through its subsidiary SunAmerica, Inc.) acquired ownership of Resource Trust Company. *Id.* The transaction was lucrative for the Debtor. Shortly thereafter, the Debtor left Resource Trust Company but retained certain long-term deferred compensation benefits. Meanwhile, having been at the helm of a highly successful business (related to retirement plan assets) for many years, and having accumulated great wealth, the Debtor focused in earnest on his own tax and estate planning around the time of the Resource Trust Company transaction with AIG.

B. *The GL3B Entities.*

As part of his tax and estate planning, on October 21, 2001, the Debtor formed GL3B Partnership as a Colorado limited liability partnership pursuant to an "Agreement of Limited Partnership." (Debtor's Exhibit 7A, the "Partnership Agreement.") At formation, the Debtor was the sole general partner (with a 1% general partner interest) and also held an 89% limited partner interest in the GL3B Partnership. *Id.* The Debtor's wife at the time (since divorced) received the remaining 10% limited partnership interest. From the get-go, the Debtor named himself the managing partner of the GL3B Partnership. *Id.*

The GL3B Partnership was formed as a family partnership to manage some of the Debtor's substantial assets. Although the Debtor characterized his financial condition circa 2001 as a "certain degree of wealth," the Debtor's assessment seems somewhat understated. By December 2013, the "non-discounted value" of the GL3B Partnership was appraised at $10,798,719. (Bank's Exhibit 20.)

At the same time that the Debtor created the GL3B Partnership (in 2001), he also created other entities as part of a complex and sophisticated tax and estate planning strategy. He formed GL3B GRAT, a grantor retained annuity trust. (Bank's Exhibit 32 at 8–9.) The GL3B GRAT terminated in 2011 and its assets were transferred to GL3B Trust I, a trust formed for the benefit of the Debtor's children. *Id.* There was another trust as well. In 2001, the Debtor established GL3B Trust II, also for the benefit of his children. *Id.*

Over time, the Debtor and his former wife transferred certain of their limited partner interests in the GL3B Partnership to the various trusts. By 2011, the ownership of the GL3B Partnership was as follows:

| Debtor | 1.0% | (General Partner Interest / Profits Interest) |
| Debtor | 51.616% | (Limited Partner Interest / Profits Interest) |
| GL3B Trust I | 19.251% | (Limited Partner Interest / Profits Interest) |
| GL3B Trust II | 28.033% | (Limited Partner Interest / Profits Interest)[6] |

### C. Management and Control of the GL3B Partnership and GL3B Trust II.

At all times from the formation of the GL3B Partnership until November 26, 2013, the Debtor was the sole general partner and the majority limited partner of the GL3B Partnership. Furthermore, during the same period and continuing through the present, the Debtor was the sole managing partner of the GL3B Partnership. (By virtue of his role as sole general partner, the Debtor merely appointed himself as the sole managing partner of the GL3B Partnership.) As a result, the GL3B Partnership is an "insider" of the Debtor within the meaning of 11 U.S.C. § 101(31)(A) (an "insider" means a "partnership in which the Debtor is a general partner").

The Partnership Agreement effectively vests all control in the general partner (or general partners) of the GL3B Partnership. (Debtor's Exhibit 7A.) For example,

Section 6.2 provides general authority and states:

... the General Partners will: [a] Have all the rights and powers, and be subject to all the restrictions, of partners in a partnership without limited partners; [b] Have, full, exclusive and complete power and authority to manage and control the business of the Partnership. . . .

Section 6.4 provides:

... all Partnership actions or decisions (including all decisions reserved to the General Partners) will be made by a majority vote of the percentage interests of the General Partners. For this purpose, each General Partner will be entitled to one vote for each 1/1000 of a percentage point (0.001%) of a Profits Interest in the Partnership that such General Partner holds as a General Partner. If there is only one General Partner, all references in this Agreement to General Partners will be deemed a reference to the sole General Partner.[7]

And, under Section 6.7:

---

6. The ownership structure of the GL3B Partnership, as of 2011, is contained in the Debtor's Disclosure Statement. (Bank's Exhibit 32 at 9.) However, with respect to GL3B Trust II, the Disclosure Statement identified a 1.5% "profits interest" plus a 26.533% limited partner interest. The Court was provided with no competent evidence regarding the distinction between a "profits interest" and a "limited partner interest" for GL3B Trust II. Indeed, in the Partnership Agreement, the "Partnership Interests" were listed in the same percentages as the "Profits Interests." (Exhibit 7A at §§ 3.2, 4.2, Exhibit A (defining Partnership Interest and Profits Interest) and Exhibit C.) And, the Debtor testified that he did not know the difference between "profits interests" and "partnership interests." Thus, as

all partner interests appear to be profits interests, the Court added 1.5% and 26.533% to arrive at the aggregate GL3B Trust II limited partner interest of 28.033%. (In any event, even if there is a technical difference between "Partnership Interests" and "Profits Interests," it makes no difference in the context of this dispute.) The Court also notes that the total of all general and limited partner interests presented by the Debtor in the Disclosure Statement is less than 100%. Although the Debtor's math appears only adds to 99.9%, the discrepancies are immaterial and do not affect the Court's analysis.

7. For purposes of convenience, the Court follows this same type of convention and refers to various rights of the "general partner"

The General Partners may delegate their day-to-day duties and responsibilities under this Agreement to a Managing Partner. The Managing Partner will be selected, and may be removed, by the General Partners. Until further action by the General Partners, the Managing Partner will be Matthew Edward Autterson.

In addition to the foregoing provisions of the Partnership Agreement which generally vest exclusive control in the general partner, many other sections of the Partnership Agreement reinforce the comprehensive powers of the general partner to control the GL3B Partnership (without any input from the limited partners). For example, the general partner is empowered to authorize borrowing by the GL3B Partnership. (Debtor's Exhibit 7A § 3.7.) The general partner makes all decisions and controls entirely all distributions to the partners. *Id.* §§ 5.1, 5.2, 5.3, and 5.5. The general partner is vested with special rights concerning transfer of partnership interests. *Id.* §§ 8.1 *et seq.* Under the Partnership Agreement, a general partner who also is a majority limited partner may transfer his partnership interest to any other person and may cause dissolution and liquidation of the GL3B Partnership. *Id.* §§ 8.2, 10.1, 10.2 and 11.1.

Based upon the express terms of the Partnership Agreement and the trial testimony, the evidence is overwhelming that the Debtor completely controlled the GL3B Partnership and the GL3B Trust II for his benefit. Indeed, the Court previously determined:

> While the trust [GL3B Trust II] and the partnership [GL3B Partnership] have maintained their separate formal legal identities for many years *they have both been fully controlled by Mr. Autterson.* They have both engaged in transactions with him, involving substantial dollars in property which could not be characterized as arms' length. Several transactions involve Mr. Autterson calling the tune on both sides of the table, having little resemblance to transactions where each side of the deal is looking out for its own interests .... [T]he partnership apparently made its funds available to Mr. Autterson, as and when he wanted money .... The partnership advanced funds to Mr. Autterson with little regard to his capacity or intent to repay the funds.

(Docket No. 215, Trans. Nov. 14, 2014 Ruling at 7–8 (emphasis added).)[8] Furthermore, the United States Bankruptcy Appellate Panel for the Tenth Circuit also confirmed that "Autterson's two trust entities [GL3B Trust I and II] ... were 'controlled' by Autterson" even though his brother, Mark Autterson, was the designated trustee. *See* BAP Decision, 2015 WL 6789168 at n. 3. As a result, the GL3B Trust II also is an "insider" of the Debtor under 11 U.S.C. § 101(31).[9]

---

since there was only one general partner of the GL3B Partnership from 2001 to 2013. As set forth below, on November 26, 2013, a new general partner was added.

8. The Bankruptcy Appellate Panel for the Tenth Circuit also relied upon these findings in the BAP Decision. BAP Decision, 2015 WL 6789168 at *5.

9. *See Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.),* 531 F.3d 1272, 1277 (10th Cir.2008) (recognizing that Section 101(31) is illustrative, not exhaustive; court may find non-statutory insider if there is a "close relationship" and "transactions were not conducted at arm's length"); *Cimino v. Writer Corp. (In re Polk),* 125 B.R. 293 (Bankr. D.Colo.1991) ("a trust ... can qualify as an insider of the debtor under the Bankruptcy Code [depending] on the facts of the particular case."). The Court and the United States Bankruptcy Appellate Panel for the Tenth Circuit already confirmed that the Debtor con-

The Debtor's exclusive control of the GL3B Partnership and GL3B Trust II is evidenced by his actions. He "borrowed" substantial funds from the GL3B Partnership and GL3B Trust II whenever he wanted for his own use and without repaying. In fact, that is the entire basis for both of the GL3B Claims. These matters already have been finally adjudicated. The Court allowed the GL3B Partnership Claim and the GL3B Trust II Claim in the amounts of $4,006,176 and $597,074, respectively. The appellate court affirmed the Claims Judgment. *Id.* at *10.

Furthermore, the Debtor made other controlling decisions for the GL3B Partnership beyond just taking money out for his own use. For example, on August 22, 2013, the Debtor executed an "Action of General Partner" (as the sole general partner) causing the GL3B Partnership to distribute, in kind, its entire interest in Kyleberg [10] Investment Co. LLC to the partners of GL3B Partnership in proportion to their respective partner interests. (Bank's Exhibit 71.) Consistent with the terms of the Partnership Agreement, the Debtor acted by himself to complete the transaction.

Prior to November 26, 2013, the Debtor's exclusive control of the GL3B Partnership would have permitted him to liquidate his sole general partner interest and majority limited partner interest in the GL3B Partnership in numerous ways under the terms of the Partnership Agreement. He could have:

- sold GL3B Partnership assets (Debtor's Exhibit 7A § 6.2);
- distributed cash or certain assets to the partners (*Id.* § 5.1 *et seq.*);
- transferred or sold his partnership interest (*Id.* § 8.1 *et seq.*); and/or
- dissolved the GL3B Partnership by withdrawing as general partner and then consenting to dissolution as majority limited partner (whereupon he could have acted as liquidating trustee).

In his testimony, the Debtor confirmed all of the foregoing powers that he had to control the GL3B Partnership prior to his action to cede control on November 26, 2013.[11]

D. *The Bank Judgment.*

The Debtor guaranteed (in an amount not to exceed $3 million) an $11.25 million loan to Communicom Corporation of America, LLC and related entities. The Bank filed suit to collect under the guaranty obligation of the Debtor. On November 25, 2013, the District Court for the City and County of Denver, Colorado issued the Bank Judgment in favor of the Bank and against the Debtor in the amount of $2,621,117 plus post-judgment interest at the statutory rate. (Bank's Exhibit 14.)

E. *Pre–Bankruptcy Change to Control of the GL3B Partnership.*

As of the date of the Bank Judgment, the Debtor was the sole general partner, the majority limited partner, and the sole

trolled the GL3B Trust II and engaged in non-arm's length transactions.

**10.** Sometimes the parties provided an alternative spelling for "Kyleberg." *See* Bank's Exhibit 33 at 9 (using "Kylberg"). Regardless of the spelling discrepancies, it is the same entity.

**11.** In his testimony, the Debtor initially denied that he had the power to dissolve the

GL3B Partnership. Then, he indicated that he did not know and would need to consult an attorney. But then he appeared to agree that he could have dissolved the GL3B Partnership. Regardless, the terms of the Partnership Agreement dictate that, as sole general partner and majority limited power, he could have dissolved the entity, liquidated its assets, and distributed the assets to the partners of the entity.

managing partner of the GL3B Partnership. For a decade, he had exercised exclusive control of the GL3B Partnership. And, the GL3B Partnership had very substantial assets when the Bank Judgment entered. According to the Debtor, the "non-discounted value of the partnership was $10,798,719 as of December 31, 2013 [about a month after the Bank Judgment]." (Bank's Exhibit 20.) The "non-discounted value" was based upon the underlying value of the GL3B Partnership's assets. Applying a discount based upon the restrictions contained in the Partnership Agreement, the Debtor stated that the "discounted value of the partnership was $5,939,295 as of December 31, 2013." And again, the Debtor had a 1% general partner interest and 51.616% limited partner interest in the GL3B Partnership.

Faced with the prospect of his valuable interest in the GL3B Partnership poten-

| Debtor | 1.0% |
| GL3B Trust II | 1.5% |
| Debtor | 51.616% |
| GL3B Trust I | 19.251% |
| GL3B Trust II | 26.533% |

*Id.* The Amendment was signed by the Debtor. The Debtor's brother, Mark Autterson, also signed as trustee of both the GL3B Trust I and GL3B Trust II. (After the Amendment, during May 2014, the Debtor's brother resigned as trustee of GL3B Trust II and was replaced as trustee by the Debtor's children, Cody and Madison Autterson, as co-trustees.) Since Section 6.6 of the Partnership Agreement required consent of "all Partners" before the addition of a new general partner, the Debtor's express consent was required to add a new general partner.

tially being available to satisfy the Bank Judgment, the Debtor took immediate steps to change his control of the GL3B Partnership. On November 26, 2013—*the very day after the entry of the Bank Judgment*—the Debtor sought to dilute his control of the GL3B Partnership. He orchestrated an "Amendment to the Agreement of Limited Partnership" (the "Amendment") to admit *another general partner* to the GL3B Partnership: GL3B Trust II. (Debtor's Exhibit 7B.) GL3B Trust II already was a limited partner of the GL3B Partnership. But the Amendment converted a 1.5% limited partner interest (which also was a 1.5% profits interest) into 1.5% general partner interest in GL3B Partnership.

As a result of the Amendment, the new ownership and control structure of the GL3B Partnership was changed to:

(General Partner Interest / Profits Interest)
(General Partner Interest / Profits Interest)
(Limited Partner Interest / Profits Interest)
(Limited Partner Interest / Profits Interest)
(Limited Partner Interest / Profits Interest)[12]

Although the change may, at first blush, appear modest (simply switching 1.5% of GL3B Trust II's limited partner interest to a 1.5% general partner interest), the actual ramifications were potentially quite significant. *Ostensibly, the Debtor could no longer completely control the GL3B Partnership. The Debtor was no longer the sole general partner. Indeed, the Debtor was no longer even the majority general partner.* Instead, as the new majority general partner, GL3B Trust II held a 1.5% general partner interest thereby outweighing the Debtor's 1% general partner interest. Since all of the main part-

---

**12.** The new partner interests and profits interests in GL3B Partnership still do not add to 100%. But the mathematical discrepancy is not material and does not affect the Court's analysis.

nership decisions were to be made by a majority vote of the general partners (Debtor's Exhibit 7A § 6.4), the Debtor's own voluntary action in agreeing to the Amendment purported to take away his power to unilaterally control the GL3B Partnership, including his ability to make distributions to himself whenever he pleased as he had done for years.

One of the Debtor's children (and now co-trustee of the GL3B Trust II), Cody Autterson, testified at the Confirmation Hearing. He appeared to be a fine young man. A recent graduate of the University of Southern California in business administration and film, he is self-employed and runs a commercial production company in California producing video content for the Internet. Cody Autterson testified that he *does not know why the GL3B Trust II became the controlling general partner of the GL3B Partnership*. In the Court's view, Cody Autterson appeared diligent and capable, but he generally was not very knowledgeable about the affairs of the GL3B Trust II and GL3B Partnership. His testimony seemed rehearsed and contrived—all in a fashion that would benefit him and his father (to the detriment of the Bank).

In any event, it is clear to the Court that Cody Autterson's father, the Debtor, while perhaps nominally only a minority general partner now, still *de facto* controls the GL3B Partnership. After all, the Debtor is now, and always has been the managing general partner of the GL3B Partnership. And, notwithstanding the addition of the GL3B Trust II as the purported majority general partner, the Debtor's brother, Mark Autterson, testified that while he was the trustee of GL3B Trust II he informally "delegated" all of GL3B Trust II's general partner rights to: the Debtor. None of the trustees of the GL3B Trust II (the new majority general partner of the GL3B Partnership) ever undertook any of the day-to-day operations or decision-making for the GL3B Partnership. For example, the Debtor recently signed a promissory note on behalf of the GL3B Partnership (as "Managing General Partner") promising to pay himself. (Bank's Exhibit 54.) Even after the ostensible change, GL3B Partnership's own 2014 United States Tax Return of Partnership Income identifies the Debtor as the only general partner of GL3B Partnership. (Bank's Exhibit 44.) In reality, the Debtor continued to be and remains in *de facto* control of the GL3B Partnership while pretending not to be.

So, why did the Debtor orchestrate the Amendment? The Court finds that the reason is quite obvious and unavoidable—to thwart the Bank's collection of the Bank Judgment. The Amendment was a sham executed the very day after the entry of the Bank Judgment and as a precursor to bankruptcy. The timing itself is extraordinarily damning to the Debtor. There is no doubt that the Debtor controlled the GL3B Partnership completely from 2001 through November 26, 2013. Asked why he prosecuted the Amendment, the Debtor merely recited, almost verbatim, the preface of the Amendment: the partners of the GL3B Partnership "desire to ensure that the operation of the Partnership's business will continue in an efficient and effective manner" and "believe that the appointment of a second General Partner would further the achievement of such goal." (Debtor's Exhibit 7B.) Mark Autterson also parroted the same supposed rationale.

This excuse is mere legal *ipse dixit*. The only thing that became more "efficient and effective" as a result of the Amendment was the Debtor's attempt to shield his assets behind his supposed loss of control. The action also caused his general partner and limited partner interests in

the GL3B Partnership to be far less valuable (at least in terms of realizable value). While the Debtor was certainly articulate and knowledgeable about financial matters during his testimony, his explanation of the Amendment was mere poppycock that destroyed his credibility.

### F. Pre–Bankruptcy Attempted Inflation of the GL3B Claims.

Along with the Amendment to the Partnership Agreement, the Debtor undertook another bit of pre-bankruptcy planning to protect himself and his insider entities, the GL3B Partnership and GL3B Trust II. He sought to inflate the GL3B Claims to add default interest. As part of the Claims Judgment, the Court determined that:

> The evidence demonstrates the charging default interest on these notes [of the GL3B Partnership and GL3B Trust II] was an afterthought. Mr. Autterson in fact testified that he never considered accruing and charging interest at the default rate until the days leading up to this bankruptcy case, *when it became advantageous to inflate the debts of his affiliates' trust and partnership so as to dilute the economic stake of . . . the bank.*

(Docket No. 215, Trans. Nov. 14, 2014 Ruling at 16 (emphasis added).) Similarly, the United States Bankruptcy Appellate Panel for the Tenth Circuit confirmed that the Debtor's accountant "did not calculate the amounts due under the Notes until Autterson was preparing to file bankruptcy. [The accountant] inflated the amounts Autterson owed by prematurely triggering interest accrual . . . ." BAP Decision, 2015 WL 6789168 at *6. The purpose of inflation of the GL3B Claims seems fairly obvious— to disenfranchise the Bank by giving the GL3B Entities *de facto* confirmation voting control. Ultimately, the Claims Judgment disallowed inflation of the GL3B Claims.

### G. The Bankruptcy Filing and Afterward.

The Bank Judgment was the impetus for the Debtor filing for bankruptcy protection under Chapter 11 on December 9, 2013.

In his Statement and Schedules, the Debtor identified his partner interest in the GL3B Partnership as his largest asset. He valued his "52.626% Ownership (Undiscounted Value)" in the GL3B Partnership at $2,869,000. (Debtor's Exhibit 2.) In a "Periodic Report Regarding Value" filed by the Debtor, the Debtor noted that the "non-discounted value" of the GL3B Partnership was $10,798,719 as of December 31, 2013 while the "discounted value" of the GL3B Partnership was $5,939,295 as of December 31, 2013. (Bank's Exhibit 20.) Based upon this information, the value of the Debtor's 52.616% partner interest in the GL3B Partnership would be from approximately $3,125,019 to $5,681,854, depending on whether or not the "discounted" or "non-discounted" value is utilized. The numbers in the Statement and Schedules and the Periodic Reports are not the same; but one thing is consistent, the Debtor confirmed (at least in the earlier stages of the bankruptcy case) that his partner interests in the GL3B Partnership are extremely valuable. Nevertheless, more recently, the Debtor asserts that the realizable value of his partner interest in the GL3B Partnership is "unknown" or could be zero.

Regarding other assets, during the bankruptcy case, the Debtor sold a Cherry Hills home for $4,650,000, netting about $2,175,820 after payment of liens and fees, which amount is held for potential distribution in this case. (Bank's Exhibit 32 at 10.) He also has about $100,000–$200,000 worth of other personal property assets (some of which he claims are exempt). Since the Debtor's home was sold, the

GL3B Partnership decided to sell a "Vail House" for the gross amount of $6,100,000. *Id.* at 11. Thereafter, the GL3B Partnership elected to buy a new house in metropolitan Denver for $1,054,612. Although owned by the GL3B Partnership, the Debtor resides there.

In terms of income, the Debtor received well over $8 million in wages and other income for the pre-bankruptcy period from 2005–2013 (i.e. about $920,000 annually). (Bank's Exhibit 32 at 6.) Such amounts apparently stemmed primarily from an AIG deferred compensation plan. He has continued to receive extraordinary income during the pendency of the bankruptcy case. For example, the Debtor's most recent "Monthly Operating Report" shows "accumulated total of cash receipts" of $1,669,799. *Id.* at 2. Meanwhile, his "accumulated total cash disbursements" during the case were $1,658,444, leaving him with "accumulated net cash flow income" during this case of just $11,355. *Id.* (In other words, he spent just about everything he received during the bankruptcy case.) The Debtor has claimed that most of his income and his rather large individual retirement account are exempt. Now, on a going-forward basis, the Debtor asserts that his estimated gross annual income for the next five years "will not be greater than $200,000" per year. (Bank's Exhibit 25 at 22.)

### V. *Legal Analysis*

#### A. *Confirmation Standards.*

■ The same Chapter 11 confirmation standards apply to both the Debtor's Fourth Plan and the Bank's Plan. "To be confirmable, a plan must comply with all applicable provisions of 11 U.S.C. § 1129." *Search Mkt. Direct, Inc. v. Jubber (In re*

*Paige),* 685 F.3d 1160, 1177 (10th Cir. 2012); *see also In re Experient Corp.,* 535 B.R. 386, 400 (Bankr.D.Colo.2015) (same). Section 1129(a)(1)–(16) allows for confirmation where each class has either accepted the plan or is not impaired. *Dill Oil Co. v. Stephens (In re Stephens),* 704 F.3d 1279, 1284 (10th Cir.2013). Alternatively, Section 1129(b) [13] provides a so-called "cramdown" mechanism that permits confirmation without the acceptance of each class provided that additional requirements are satisfied including that the reorganization plan "does not discriminate unfairly, and is fair and equitable" with respect to non-accepting impaired classes. 11 U.S.C. § 1129(b)(1); *see also Stephens,* 704 F.3d at 1284. Section 1129(b) also contains the "absolute priority rule." *Id.* Regardless of whether confirmation is contested or not, the plan proponent "must demonstrate compliance [with Section 1129] by a preponderance of the evidence." *Paige,* 685 F.3d at 1177; *see also FB Acquisition Prop. I, LLC v. Gentry (In re Gentry),* 807 F.3d 1222, 1226 (10th Cir.2015) (confirming that burden of proof is on plan proponent). In the special situation of competing reorganizations plans (a fairly rare phenomenon), "the court may confirm only one plan." 11 U.S.C. § 1129(c). In any event, the Bankruptcy Court has an independent duty to ensure compliance with all confirmation standards. *Cf. United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260, 278, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010) (holding that Bankruptcy Court must independently ensure that Chapter 13 plan complies with Bankruptcy Code).

In this case, both the Debtor's Fourth Plan and the Bank's Plan are contested in that at least one impaired unsecured class has voted to reject the proposed reorgani-

---

**13.** Unless noted otherwise, all "Sections" refer to sections of the Bankruptcy Code. 11

U.S.C. § 101 *et seq.*

zation terms.[14] As a consequence, cramdown is the only avenue available for confirmation of either the Debtor's Fourth Plan or the Bank's Plan. In cramdown, the plan proponent generally must satisfy all of the requirements of Sections 1129(a)(1)–(7) and (9)–(16)[15] plus Sections 1129(b)(1) and (2)(B). However, to complicate things, not all the requirements are applicable in every case. For example, Section 1129(a)(6) applies only to plans in which a governmental regulatory commission has jurisdiction over the debtor's business rates. And, Section 1129(a)(13) speaks only to the continuation of retiree benefits in corporate cases.

Parsing Section 1129 in the specific context of this individual Chapter 11, in order to be confirmable, the respective plan proponents must prove, by a preponderance of the evidence, compliance with the following: Section 1129(a)(1), (2), (3), (4), (5), (7), (9), (10), (11), (12), (15), (16) and Sections 1129(b)(1) and (b)(2)(B).[16]

---

14. As set forth below, the Bank's Plan asserted that Class 4 was unimpaired and not entitled to vote. The Court determines that Class 4 is impaired and rejected the Bank's Plan.

15. Thus, in the context of cramdown, the plan proponent need not satisfy Section 1129(a)(8).

16. The foregoing portions of Section 1129 state:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the debtor ... for services or for costs and expenses in or in connection with the case ... has been approved by, or is subject to the approval of, the court as reasonable.

(5)(A)(i) The proponent of the plan has disclosed the identity and affiliations of any [trustee] ...; and (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy ....

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date. ....

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim ....

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—

(i) of a total value ... equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan ....

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan ....

B. *The Debtor's Fourth Plan.*

1. *The General Framework of the Debtor's Fourth Plan.*

The Debtor's Fourth Plan is a liquidating plan of reorganization. (Docket No. 400.) In broad strokes, the Debtor proposed to establish a liquidating trust. Most of the assets of the Bankruptcy Estate (including the Debtor's escrowed cash of approximately $2.2 million, the Debtor's general and limited partner interest in the GL3B Partnership, and a few odds and ends) would be transferred to the liquidating trust. The remaining assets of the Bankruptcy Estate would revested in the Debtor. Thereafter, the trustee would liquidate the assets in the liquidating trust. The principal non-cash asset, the Debtor's general and limited partner interest in the GL3B Partnership, would be liquidated through a "commercially reasonable" bid process or auction subject to a right of first refusal in favor of the general partner of the GL3B Partnership. The Debtor

projected that the process will yield an unknown amount which could be zero or potentially higher. The liquidating trustee would pay allowed administrative claims immediately. After liquidation, the liquidating trustee would pay the allowed general unsecured claims.

The Debtor's Fourth Plan proposed seven classes of claims and interests. However, Class 1 (priority claims), Class 2 (secured claim of JP Morgan Chase) and Class 3 (secured claim of Arapahoe County) are not impaired or were already paid in full prior to the Confirmation Hearing. Class 4 consisted of the "allowed secured claim" of the Bank "if any, based upon its assertion that the Debtor subordinated all of his rights to payment on his claim against Kylberg to the Bank's right to payment on its claim against Kylberg." This class is impaired.

But, the heart of the classification scheme in the Debtor's Fourth Plan is

(15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5–year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

(16) All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

(b) (1) ... if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of

the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements ....

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section....

**392**

Classes 5–7. For Class 5, the Debtor identified all "Allowed Unsecured Claims not otherwise classified . . ." *Id.* Thus, Class 5 includes the GL3B Partnership Claim, the GL3B Trust II Claim, and the Bank Claim. Class 6 merely is an "administrative convenience class" of small claims. Class 7 consists of the "Equity Interest of the Debtor in his assets that are property of the Estate." Class 7 is not a creditor class.

The Debtor projects that the liquidating trustee would be able to pay allowed Class 5 claims [17] (unsecured claims) about $1.9 million resulting in a recovery of about 26%, without counting any funds that might be received from sale of the Debtor's general partner and limited partner interests in the GL3B Partnership. Again, the additional recovery, if any, is considered "unknown." The Debtor offered no testimony concerning the propriety of the proposed sale process or likely recovery in any auction. The Debtor proposes to pay 80% of the allowed Class 6 claims (administrative convenience claims). According to the Debtor's Liquidation Analysis, all of the foregoing recoveries are very similar to what the Debtor projects a Chapter 7 liquidation would yield. In a Chapter 7, the Debtor contends that allowed Class 5 claims would receive $1.8 million (instead of $1.9 million) resulting in a recovery of about 25% (instead of 26%). The difference primarily stems from the Debtor's projection of higher statutory fees for a Chapter 7 trustee as against lower fees for the proposed liquidating trustee.

2. *Voting and the Bank's Objections to the Debtor's Fourth Plan.*

The Debtor solicited votes on the Debtor's Fourth Plan. With respect to impaired classes of creditors,[18] only one class, Class 6 (administrative convenience claims) accepted Debtor's Fourth Plan. The Debtor reported the following:

- Class 4 (Bank Claim arising from Kyleberg subordination):

 Only one creditor, the Bank voted. It voted to reject.

- Class 5 (unsecured claims):

 The Debtor reported that the $4,006,176 GL3B Partnership Claim voted to accept; the $579,074 GL3B Trust II Claim voted to accept; but the $2,629,159 Bank Claim voted to reject. Thus, the Section 1126(c) threshold was not satisfied and Class 5 rejected.[19]

- Class 6 (administrative convenience claims)

 Only one creditor, Sherman & Howard, voted. It voted to accept.

In addition to voting to reject the Debtor's Fourth Plan, the Bank also objected to the Debtor's Fourth Plan on the basis of alleged non-compliance with Sections 1129(a)(1), (2), (3), (7), (8), (10), (11) and

---

17. Assuming that the Bank Claim, the GL3B Partnership Claim and the GL3B Trust II Claim are allowed, Class 5 will total $7,232,410.

18. The Debtor's vote to accept his own Fourth Plan, as an equity interest, is essentially irrelevant. *See* 11 U.S.C. § 1129(a)(10). Thus, the Court need not further address Class 7.

19. Section 1126(c) states: "[a] class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least

two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . . " Given the claims included in Class 5, the Bank has a blocking position. In other words, since the Bank holds slightly more than 36% of the Class 5 claims, if the Bank rejects then Class 5 is deemed to reject. Furthermore, since the GL3B Claims are insider claims under Section 101(31)(A), likely such claims should not count for voting purposes anyway. *See* 11 U.S.C. § 1129(a)(10).

Section 1129(b). (Docket Nos. 345 and 375.)

### 3. *The Debtor's Fourth Plan Cannot Be Confirmed.* [20]

One of the key mandates for confirmation the Debtor's Fourth Plan is that at least one impaired class of creditors must accept. Section 1129(a)(10) states the following as a confirmation requirement:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by an insider.

In this case, the Debtor concedes that Class 4 and Class 5 have rejected the Debtor's Fourth Plan. Thus, the Debtor offers Class 6 (administrative convenience claims) as the only impaired class of creditors that ostensibly has accepted the Debtor's Fourth Plan. In a very real sense, the entire linchpin of the Debtor's strategy and the Debtor's Fourth Plan is Class 6. Without Class 6, the Debtor' Fourth Plan necessarily fails.

What is Class 6? The Debtor's Fourth Plan defined Class 6 as:

Allowed Unsecured Claims that are in an amount less than $10,000 or, if greater than $10,000, where the holder of any such claim elects to reduce the claim to $10,000.

In bankruptcy reorganization parlance, Class 6 purports to be an "administrative convenience class" of the "small fry." The idea is that the claims are so numerous and so small that it would cause an administrative headache for the reorganized debtor or a liquidating trustee to deal with the claims in the normal distribution process. *See CRE/ADC Venture 2013, LLC v. Rocky Mountain Land Co., LLC (In re*

*Rocky Mountain Land Co., LLC)*, 2014 WL 1338292 at *15 (Bankr.D.Colo., Apr. 3, 2014) ("convenience classes are generally used by a plan proponent to clear out numerous small claims"). Oftentimes, administrative costs, including trustee or attorney time, accounting expenses, plan solicitation costs, bank charges, postage, and the like, are alleged to outweigh the costs of just paying *de minimus* claims. Thus, the administrative convenience name. The concept is to pay the small creditors, usually in full shortly after confirmation. *Id.* (typically paid "soon after plan confirmation"). That way, the reorganized debtor or liquidating trustee can concentrate on the serious claims and avoid unnecessary administrative expenses. And, the rest of the creditors generally do not complain. Why should they? After all, in advancing an administrative convenience class, the plan proponent argues that it will save time and money, thus benefitting the larger creditor body. Furthermore, the Bankruptcy Code generally recognizes and permits the use of an appropriate administrative convenience class. *See* 11 U.S.C. § 1122(b) ("A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.")

So, which creditors are in Class 6 of the Debtor's Fourth Plan? The Debtor's Disclosure Statement provided an answer. (Bank's Exhibit 32 at 16.) The Debtor stated:

Class 6 consists of all unsecured claims that are in an amount less than $10,000 or that elect to reduce their claim to $10,000. The Debtor believes the Claims in this Class are held by AT & T,

---

**20.** Given the Court's disposition of the Debtor's Fourth Plan below, the Court need not, and does not, address all of the Bank's objections to the Debtor's Fourth Plan.

Xcel Energy, Comcast, Denver Water, Sherman & Howard and Progressive Insurance. The total of these claims is approximately $11,723. To the Debtor's knowledge, none of these claims is disputed. The holders of Allowed Class 6 Claims will each be paid 80% of their Allowed Claim. Payment will be made on the Effective Date of the Plan from the Liquidating Trust. This Class is impaired and is entitled to a vote.

*Id.* Thus, the Debtor appeared to propose a fairly narrow class of six small claims that would be paid a high percentage (80%) shortly after confirmation.

But, the Debtor's own testimony at the Confirmation Hearing proved that the Debtor's representation in the Disclosure Statement was false. In fact, AT & T, Xcel Energy, Comcast, Denver Water and Progressive Insurance all had been paid (improperly and without Court authorization) in full by the Debtor shortly after the Debtor filed for bankruptcy protection. Nevertheless, the Debtor repeatedly asserted the falsehood prior to the Confirmation Hearing.

In any event, that leaves only one creditor supposedly in the Class 6 administrative convenience class: Sherman & Howard. Sherman & Howard is a highly-regarded Denver law firm of long

standing and is no stranger to the Debtor or this saga. The evidence at trial established that Sherman & Howard represented the Debtor personally for many years both before and after the Debtor filed for bankruptcy protection.[21] *See* Bank's Exhibit 57 (Sherman & Howard post-petition invoice and post-petition payment by Debtor) and Bank's Exhibit 58 (Sherman & Howard pre-petition invoice and post-petition payment by Debtor). After the Debtor's bankruptcy filing, the Debtor (without Court authorization) elected to pay Sherman & Howard for pre-petition debt. *Id.* Sherman & Howard also represented and continues to represent the GL3B Partnership and the GL3B Trust II. In fact, Sherman & Howard advised the GL3B Entities in all aspects of this bankruptcy case and even represented the GL3B Partnership and GL3B Trust II in the Confirmation Hearing (including arguments in favor of the Debtor's Fourth Plan and objections to the Bank's Plan). Thus, the Debtor used the very law firm that represents him and his family partnership and family trust in an attempt to secure confirmation of the Debtor's Fourth Plan.[22] Perhaps not surprisingly, Sherman & Howard elected to vote in favor of its long-

---

21. Sherman & Howard's post-petition work for the Debtor does not include acting as the Debtor's primary bankruptcy counsel. A different law firm has served in that role. The only evidence of Sherman & Howard's continuing representation of the Debtor himself was in relation to estate planning issues. But the Debtor continues to be the managing partner of GL3B Partnership which Sherman & Howard also represents.

22. The Bank argued that Sherman & Howard is an "insider" of the Debtor such that Sherman & Howard's vote should not count at all. *See* 11 U.S.C. §§ 101(31)(A) (defining "insider") and 1129(a)(10) (insider votes do not count for impaired class acceptance). But,

Sherman & Howard does not fall within the specific categories of "insiders" listed in Section 101(31)(A). Thus, the question becomes whether Sherman & Howard is a "non-statutory insider" by virtue of its close, long term relationship with the Debtor and the GL3B Entities. *See Carl Zeiss Meditec*, 531 F.3d at 1277 (defining "non-statutory insider" and finding that appropriate inquiry is "whether there is a close relationship *and* whether there is anything other than closeness to suggest that any transactions were not conducted at arm's length"). Given the Court's decision on other grounds, it is not necessary for the Court to decide the "insider" issue at this juncture.

term client, the Debtor.[23]

Under the foregoing circumstances, is it legally possible that Sherman & Howard's vote as the sole member of the Class 6 administrative convenience class (which is the only impaired class that voted to accept the Debtor's Fourth Plan) could conceivably carry the day and result in confirmation of the Debtor's Fourth Plan? The answer is virtually self-evident: of course not. There are a myriad of reasons why the proposed gerrymander is ineffective and impermissible.

a. *The Debtor's Fourth Plan Fails Because the Sherman & Howard Claim Does Not Belong in Class 6.*

■ On a technical basis, Sherman & Howard does not actually fall into the definition of Class 6 in the Debtor's Fourth Plan. Sherman & Howard never filed a proof of claim against the Debtor. Instead, on the Debtor's Statement of Financial Affairs and Schedules, the Debtor listed an undisputed debt owed to Sherman & Howard of exactly $10,000—not a penny more, not a penny less. But the Debtor's Fourth Plan defined Class 6 as allowed unsecured claims "that are in an amount *less than $10,000 or, if greater than $10,000,* where the holder of any such claim elects to reduce the claim to $10,000." (Emphasis added.) The Debtor's problem is that the Sherman & Howard Claim is not "less than $10,000"; but neither is it "greater than $10,000." It is instead something else: a claim of exactly

$10,000.[24] So, strictly applying the Debtor's own definition (possibly a drafting error), the Sherman & Howard Claim must be part of Class 5 which is a class that rejected the Debtor's Fourth Plan. Thus, the Sherman & Howard Claim cannot serve as the basis for an accepting impaired class.

But, that is only an unsatisfying technicality. The central problem is that the Debtor's Fourth Plan represents a manipulative scheme to gerrymander acceptance in bad faith and in violation of the Bankruptcy Code.

b. *The Debtor's Fourth Plan Fails Because Separate Classification of the Sherman & Howard Claim Is Not Reasonable and Necessary for Administrative Convenience.*

■ The Debtor's Fourth Plan presents a classification fiasco. Section 1122(b) does allow for creation of an administrative convenience class but only "as reasonable and necessary for administrative convenience." In this case, the Debtor repeatedly represented that Class 6 included six small administrative claims. But it was not true. Even if the Court ignores the technical problem, there would only be one claim in Class 6—the unsecured Sherman & Howard Claim. Assuming Sherman & Howard is not an "insider," neither is it truly an arm's length creditor. It has represented (and continues to represent) the Debtor and the GL3B Entities. In

---

**23.** In doing so, Sherman & Howard voted to receive 80% of the Sherman & Howard Claim notwithstanding that the Bank's Plan proposed to pay 100% of the Sherman & Howard Claim.

**24.** The amount of the Sherman & Howard Claim also is somewhat suspect. According to the evidence at the Confirmation Hearing, the Sherman & Howard Claim is based upon a series of invoices for legal services rendered from July 10, 2013 to December 14, 2013.

(Bank's Exhibits 6–10.) The invoices are all addressed to the GL3B Partnership, not the Debtor individually. And, the unredacted portions of the invoices which purport to identify legal services rendered to the Debtor total approximately $30,700, not $10,000. *Id.* So, the Debtor acknowledges that he owes Sherman & Howard at least $30,700 (which amount would not be a small administrative convenience claim) but nevertheless listed the Sherman & Howard at $10,000.

any event, the Debtor introduced no evidence whatsoever supporting any administrative convenience for the payment of one creditor. In fact, in his testimony at the Confirmation Hearing, the Debtor was not even able to identify why the Sherman & Howard Claim should be in a separate class from other general unsecured claims. Thus, the Debtor failed in meeting his burden of proof.

■ As a general legal matter, the Court determines that separate classification of one purported administrative convenience claim can never be "reasonable and necessary for administrative convenience" within the meaning of Section 1122(b). *See In re National/Northway L.P.*, 279 B.R. 17, 23 (Bankr.D.Mass.2002) ("there is no justification for an administrative convenience class" of one claim). As an unsecured claim, the Sherman & Howard Claim, should have been grouped with other unsecured claims. It is not reasonable and not necessary for administrative convenience to create a separate impaired class of one for Sherman & Howard. Thus, the Debtor has created an improper classification in violation of Section 1122(b). *See Rocky Mountain Land*, 2014 WL 1338292 at *15 (Chapter 11 plan proposed an administrative convenience class of five creditors only; court determined that "Debtor's classification [of the administrative convenience class] artificially impairs those claims and gerrymanders the vote to obtain an accepting class"). The non-compliance with Section 1122(b) classification also dictates that the Debtor fails the test of Sections 1129(a)(1) and (a)(2) which requires that the plan and the plan proponent must comply with "the applicable provisions of this title." *See id.* at *13 ("the phrase 'applicable provisions' has been interpreted to include § 1122"); *California Fed. Bank, F.S.B. v. Moorpark Adventure (In re Moorpark Adventure)*, 161 B.R. 254, 256 (Bankr.C.D.Cal.1993) (same); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr.N.D.Ill.1984) ("faulty use of Section 1122(b) in classifying unsecured claims gives rise most appropriately to a denial of confirmation under Section 1129(a)(1) ...."). Accordingly, the Debtor's Fourth Plan cannot be confirmed.

### c. The Debtor's Fourth Plan Artificially Impairs the Sherman & Howard Claim.

■ The Debtor's Fourth Plan also is unconfirmable because the obvious purpose of the improper classification was to manipulate and gerrymander acceptance of the Debtor's Fourth Amended Plan through the Debtor's law firm. The Bankruptcy Code requires that "at least one class of claims that is impaired under the plan has accepted the plan." 11 U.S.C. § 1129(a)(10). Acceptance of a plan requires that creditors holding "at least two thirds in amount and more than one-half in number of the allowed claims" favor the reorganization plan. 11 U.S.C. § 1126(c). Knowing that the Debtor could not obtain the Bank's acceptance of the Debtor's Fourth Plan, the Debtor created a bogus and artificially impaired administrative convenience class to gerrymander consent.

■ Artificial impairment occurs when the plan proponent "causes the class to be impaired without an economic justification for doing so, for the apparent purpose of obtaining the required vote" of an impaired class. *In re Deming Hospitality, LLC*, 2013 WL 1397458 at *2 (Bankr. D.N.M., Apr. 5, 2013). Artificial impairment has generally been held to violate Sections 1129(a)(10) or 1129(a)(3). *Id.* Regardless of the Bankruptcy Code section, the practice is condemned. Class 6 is artificially impaired since the Debtor proposed to pay Sherman & Howard 80% of the Sherman & Howard Claim (*i.e.*, only

$8,000 instead of $10,000). Normally, small administrative expense claims are proposed to be paid in full. *See* S.Rep. No. 989, 95th Cong., 2nd Sess. 125, n.26 (1978) ("Payments in cash of small claims in full is common practice in reorganization."). The reason is explained in *In re Mastercraft Record Plating, Inc.*, 32 B.R. 106 (Bankr.S.D.N.Y.1983):

> The purpose of § 1122(b) is to allow a plan to reduce the number of creditors eligible to vote. This result is accomplished by offering creditors holding small claims of perhaps a few hundred dollars each a 100% payment and thus providing that they are not impaired.

By doing so, the debtor avoids the cost of sending disclosure statements, soliciting votes from the *de minimus* creditors, and making fractional distributions. In this case, the Debtor did the opposite. He decided to pay Sherman & Howard only 80% (instead of 100%) of the Sherman & Howard Claim in order to create an impaired class that could vote in favor of the Debtor's Fourth Plan. Certainly, there is no requirement that all administrative convenience classes be paid in full. There may be legitimate reasons not to propose full payment in some proceedings. But, in this case, the Debtor offered no evidence or explanation to justify creating the separate administrative convenience class and then impairing it.[25] The Court easily concludes that the Debtor artificially impaired Class 6 by proposing to short Sherman & Howard by $2,000. *See Village Green I, GP v. Fed. Nat'l Mortg. Ass'n. (In re Village Green I, GP)*, 811 F.3d 816, 819 (6th Cir.2016)("that the minor claimants [Debtor's former lawyer and accountant] are closely allied with [the Debtor] only compounds the appearance that impairment of this claim had more to do with

circumventing the purposes of § 1129(a)(10) than with rationing dollars").

### d. *The Debtor's Fourth Plan Impermissibly Gerrymanders an Accepting Class.*

■ Even if Class 6 was not impaired artificially, it was still impermissibly gerrymandered in contravention of Sections 1122(a) and 1129(a)(10). The "main judicial gloss on § 1122(a) is that the subsection prohibits a debtor from separately classifying similar claims to 'gerrymander' a consenting class." *Deming Hospitality*, 2013 WL 1397458 at *2. "If a creditor objects to the classification scheme on gerrymandering grounds, most courts require the plan proponent to justify the classification." *Rocky Mountain Land*, 2014 WL 1338292 at *15.

■ Although there is no controlling Tenth Circuit precedent on the issue, the Court finds compelling and adopts the "one clear rule" approach against gerrymandering to satisfy Section 1129(a)(10), whether the source is Section 1122(a) or Section 1129. *Deming Hospitality*, 2013 WL 1397458 at *3 (citing *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir.1991)); *see also Rocky Mountain Land*, 2014 WL 1338292 at *15 (agreeing with *Deming Hospitality* approach). In *Deming Hospitality*, the court held:

> Since the plan proponent has the burden of proving compliance with § 1129 in any event, the Court will place the burden on the plan proponent to justify any separate classification of substantially similar claims, if a party in interest objects on gerrymandering grounds. If the plan proponent carries its burden of showing that substantially similar claims

---

**25.** The evidence at trial was that the Debtor has $2,175,820 in cash on hand. Thus, the payment of $2,000 would have been possible and immaterial.

were not separately classified to gerrymander a consenting class of impaired claims, the Court will make no further inquiry into whether the separate classification of similar claims violates § 1122(a); any remaining confirmation issues would be addressed under § 1129. Analyzing separate classification objections in this way protects creditors from gerrymandering and/or other improper classification attempts, while not taking undue liberties with the text of § 1122(a).

*Id.* In this case, the Debtor offered no evidence to justify the separate classification of the only Class 6 administrative convenience claim (the Sherman & Howard Claim). So, the Debtor failed to meet his burden. It is apparent that the separate classification is an impermissible but bald-faced attempt to gerrymander an accepting impaired class in violation of Sections 1122(a) and 1129(a)(10).

e. *The Debtor's Fourth Plan Unfairly Discriminates and Is Not Fair and Equitable.*

 The Debtor's Fourth Plan also fails under a cramdown analysis. Because Class 5 rejected the Debtor's Fourth Plan, the Debtor was required to satisfy Section 1129(b)(1) including proving that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims ... that is impaired under, and has not accepted, the plan." Gerrymandering does not fare well in cramdown. As explained by Judge Krieger in *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 689 (Bankr. D.Colo.1995):

Issues of gerrymandering can and should be addressed as part of the "un-

fair discrimination" analysis of § 1129(b). If the plan proponent artificially creates a class of claims solely to obtain the affirmative vote of an impaired class as required by § 1129(a)(10), the cramdown analysis will necessarily be invoked. To allow a cramdown a court must find that the plan does not discriminate unfairly. Gerrymandering or disparate treatment of classes of similar claims falls squarely within the concept of unfair discrimination.[26]

 To determine whether a plan discriminates unfairly under Section 1129(b)(1), courts have considered a variety of factors including, among others: "(1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against." *In re Riviera Drilling & Expl. Co.*, 2012 WL 6719591 (Bankr.D.Colo., Dec. 19, 2012) (citing *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D.Tenn.1989)).

In this case, the Debtor proposes to split the unsecured claims into Class 5 (general unsecured) and Class 6 (administrative convenience). The Bank's Claim and the GL3B Claims are in Class 5. The Sherman & Howard Claim purportedly is in Class 6. The disparate treatment of Class 5 and Class 6 is discriminatory in that the Debtor proposes to pay 80% of the Sherman & Howard Claim shortly after confirmation but to pay Class 5 only about 26% of allowed claims unless there is a further recovery from the sale of the Debtor's partner interests in the GL3B Partnership. However, the Debtor acknowledges that

**26.** *City of Colorado Springs* indicated that gerrymandering should be considered only under Section 1129(b)(1), not under Section

1122(a). In this case, the Court determines that gerrymandering is impermissible under both statutes.

the result of the proposed sale is "unknown" and could yield zero. Thus, there is a distinct difference in treatment between Class 5 and Class 6.

Typically there may be a "reasonable basis" for the disparate treatment between an administrative convenience class and general unsecured class. Usually, the basis is that payment of administrative convenience claims will result in administrative savings, thus resulting in overall better recovery for creditors. While this makes sense in many reorganizations, it does not hold true in this case. As set forth above, the Debtor has provided no evidence to support a reasonable basis for the discrimination between Class 5 and Class 6. There is no administrative convenience whatsoever. And, the Debtor cannot confirm the Debtor's Fourth Plan without the discrimination because Class 6 is offered as the only impaired class that has accepted the Fourth Amended Plan. It is evident that the discrimination between Class 5 and Class 6 is not proposed in good faith. Instead, quite the opposite. The only reason for the discrimination is that the Debtor is trying to invent an impaired accepting class by gerrymandering classifications to the detriment of the Bank. Under these circumstances, the Debtor's Fourth Plan discriminates unfairly against the Bank and Class 5.

### f. *The Debtor's Fourth Plan Is Proposed in Bad Faith.*

█ Principles of good faith permeate the Bankruptcy Code. In the context of Chapter 11 confirmation, the plan proponent must prove, by a preponderance of the evidence, that the "plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Bankruptcy Code does not define the flexible concept of "good faith." However, the Tenth Circuit Court

of Appeals has twice endorsed the following standard:

> The test of good faith is met if there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purposes of the Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the company to continue its business and pay its debts in accordance with the plan provisions.

*Paige,* 685 F.3d at 1178 (quoting *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.),* 779 F.2d 1456, 1459 (10th Cir.1985)). In assessing good faith, "courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions." *Paige,* 685 F.3d at 1178; *Pikes Peak Water,* 779 F.2d at 1460.

█ A standard such as "good faith" requires a court to assess the "totality of the circumstances." *Rocky Mountain Land,* 2014 WL 1338292 at *9. Put another way, in addition to assessing technical compliance with the Bankruptcy Code and feasibility, the court also should consider "whether a plan is proposed with honesty and sincerity" and "whether a plan's terms or the process used to seek its confirmation was fundamentally fair." *Riviera Drilling,* 2012 WL 6719591 at *5 (citing *In re Global Water Tech., Inc.,* 311 B.R. 896, 903 (Bankr.D.Colo.2004)).

█ Although the focus is on the plan of reorganization, in this case, all parties stipulated during oral argument at the Confirmation Hearing that the Court also could consider both the pre-petition conduct of the Debtor as well as the progress of the bankruptcy case leading to the Debtor's Fourth Plan. In this case, the Debtor's conduct epitomizes bad faith and renders the Debtor's Fourth Plan unconfirmable under Section 1129(a)(3).

### 1. *The Pre–Petition Conduct of· the Debtor Establishes His Bad Faith.*

As set forth in the Factual Findings, the Debtor created the GL3B Partnership on October 21, 2001 to manage some of the Debtor's substantial wealth. Although the Debtor's ownership stake changed over time, by 2011, the Debtor held a 1% general partner interest and 51.616% limited partner interest in the GL3B Partnership. At all times from the formation of the GL3B Partnership until November 26, 2013, the Debtor was the sole general partner and majority limited partner of the GL3B Partnership. Furthermore he has always been (even through today), the managing partner of the GL3B Partnership.

There is no doubt that the Debtor completely controlled GL3B Partnership and used it for his own purposes for over a decade. His control was a function of the Partnership Agreement which vests all meaningful control in the general partner ·(or general partners). *See* Debtor's Exhibit 7A §§ 3.7, 5.1, 5.2, 5.3, 5.5, 6.2, 6.4, 6.7, 8.1, 8.2, 10.1, 10.2 and 11.1. The Court previously determined that "[w]hile the trust [GL3B Trust II] and the partnership [GL3B Partnership] have maintained their separate formal legal identities for many years they have been fully controlled by Mr. Autterson." (Docket No. 215, Trans. Nov. 14, 2014 Ruling at 7–8.) This finding of control also was confirmed on appeal by the United States Bankruptcy Appellate Panel for the Tenth Circuit in the BAP Decision. *See* BAP Decision, 2015 WL 6789168 at *5.

In addition to the Partnership Agreement (which vested control in the Debtor), the Debtor demonstrated his control by entering into multiple non-arm's length transactions with the GL3B Partnership. He "borrowed" funds whenever he wanted for his own personal use without repaying. The Court previously found that "the partnership [GL3B Partnership] apparently made its funds available to Mr. Autterson, as and when he wanted money . . . . The partnership advanced funds to Mr. Autterson with little regard to his capacity or intent to repay the funds." (Docket No. 215, Trans. Nov. 14, 2014 Ruling at 7–8.) The Debtor also caused distributions to be made to the partners of the GL3B Partnership when he wished. (Bank's Exhibit 71.)

But, the very day after the entry of the Bank Judgment, the Debtor orchestrated a scheme to purportedly change his long-time control of the GL3B Partnership by causing GL3B Trust II (which he also controlled) to become the nominal majority general partner of the GL3B Partnership, thus purportedly trumping the Debtor's 1% general partner interest. (Debtor's Exhibit 7B.) Then, having purportedly divested himself of control of the GL3B Partnership, the Debtor filed for Chapter 11 bankruptcy protection.

The Court does not find that the formation of the GL3B Partnership, GL3B Trust I and GL3B Trust II was done in bad faith or with malevolent intent. Further, there is no indication that the Debtor engaged in bad faith conduct in the changing ownership of the GL3B Partnership between 2001 and 2011. But the November 26, 2013 Amendment to the Partnership Agreement is quite a different story. It was part of a scheme to thwart the Bank's collection of the Bank Judgment. The Amendment was a sham executed the day after the entry of the Bank Judgment and is the very epitome of brazen bad faith.

To be sure, debtors often file for bankruptcy protection after suffering adverse judgments. The Court does not suggest that such post-judgment bankruptcy filings, by themselves, establish bad faith.

*See In re Experient Corp.*, 535 B.R. 386, 410–11 (Bankr.D.Colo.2015) ("[Debtor's management] openly testified that the reason [debtor] filed for bankruptcy relief was [a] state court judgment. However, this alone is not indicative of bad faith."). Quite to the contrary, adverse litigation results may justify bankruptcy as a mechanism to fairly pay creditors and allow reorganization consistent with the Bankruptcy Code. But, that is not what happened in this proceeding. Instead, after the entry of the Bank Judgment, *but immediately before the bankruptcy filing*, the Debtor undertook steps to dilute his management and control of the GL3B Partnership for the purpose of thwarting collection of the Bank Judgment and effectively shielding the realizable value of his assets in the resulting bankruptcy proceedings. As a result, the Debtor purports no longer to have the power to sell the assets of the GL3B Partnership, distribute cash or assets to the partners of the GL3B Partnership, or dissolve and liquidate the GL3B Partnership—all notwithstanding that the Debtor created the GL3B Partnership, is a general partner (formerly the only general partner), is the majority limited partner, and is the managing partner. The Court determines that the Debtor's conduct vis-à-vis the Amendment was undertaken in bad faith and taints the bankruptcy process.

And, the Amendment is not the only example of the Debtor's bad faith pre-petition conduct. Immediately prior to the bankruptcy filing, the Debtor inflated the GL3B Claims and listed the inflated amount on his Statement of Financial Affairs and Schedules. He did so to dilute the economic stake of the Bank and create strategic advantage in the bankruptcy process. The math was easy. The Bank Judgment was $2,621,117. Putting the GL3B Entities in the same class with the Bank, the aggregate of the GL3B Claims would need to be higher than about $5,250,000 for the GL3B Entities to control the class (*i.e.*, two-thirds of amount of the class under Section 1126(c)). By inflating the GL3B Claims to an aggregate of $6,783,393 (as listed by the Debtor in his Statements and Schedules), the Debtor easily passed this threshold and appeared to have more than the required two-thirds supermajority for the combined class. Then, the Debtor used the inflated GL3B Claims in the initial iterations of his plan of reorganization. The Debtor's inflation strategy failed only when the Claims Judgment recognized the improper inflation and set the aggregate of the GL3B Claims at just $4,603,250 (an amount less than two-thirds of the amount of the combined class). But the point is this: the intentional effort to inflate the GL3B Claims immediately before the bankruptcy filing further demonstrates the Debtor's bad faith.

### 2. The Debtor's Fourth Plan Demonstrates His Bad Faith.

The Debtor's Fourth Plan is the culmination of a pattern of bad faith that started pre-petition and has continued through the bankruptcy process. Despite the Debtor's wealth and ability to satisfy his creditors, the Debtor chose to avoid paying them by engaging in a bankruptcy masquerade. During his last two years in bankruptcy, the Debtor has reported "accumulated total cash receipts" of $1,669,799. But he also spent "accumulated cash disbursements" of $1,658,444. His "accumulated net cash flow income" during this case is just $11,355. To be sure, the Debtor has asserted that the great majority of his income is exempt. However, in evaluating the totality of the circumstances, the Court can note the Debtor's election to use his substantial income (even if exempt) to fund his extravagant personal expenses all while making no substantial

effort to pay his creditors. *See In re Weber,* 209 B.R. 793, 798–99 (Bankr. D.Mass.1997) (finding that to assess good faith under Section 1129(a)(3), it is appropriate to examine use of the debtor's resources during the administration of the Chapter 11 case).

In addition, the Debtor's prosecution of the Debtor's Fourth Plan, alone, demonstrates bad faith conduct. As set forth above, the entire premise of the Debtor's Fourth Plan is an improper gerrymander. By knowingly misrepresenting the number of claimants in Class 6, the Debtor attempted to create the impression that there existed a basis for an administrative convenience class when, in fact, there was no such basis. Then, the Debtor used his own law firm to manufacture the only alleged impaired accepting class so that he could claim that the Debtor's Fourth Plan was confirmable. Prosecution of the case under these circumstances circumvents the purposes of the Bankruptcy Code and constitutes bad faith. *See Village Green,* 811 F.3d 816, 819 (using former law firm to create artificially impaired administrative convenience class is transparent artifice to circumvent Bankruptcy Code and constitutes bad faith); *see also Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (Matter of Sandy Ridge Dev. Corp.),* 881 F.2d 1346, 1353 (5th Cir.1989) (suggesting that deeming a class impaired for the sole purpose of creating an accepting class can constitute lack of good faith).

### C. *The Bank's Plan.*

#### 1. *The General Framework of the Bank's Plan.*

The Bank's Plan is a liquidating plan of reorganization. (Bank's Exhibit 33.) In general terms, the Bank proposed to establish a liquidating trust. All of the major assets of the Bankruptcy Estate (including the Debtor's escrowed cash of $2.2 million, the Debtor's general and limited partner interest in the GL3B Partnership, and the remaining odds and ends) would be transferred to the liquidating trust. So far, the Bank's Plan sounds quite similar to the Debtor's Fourth Plan. But the similarities end rather dramatically with classification and distribution.

The Bank's Plan proposed classification of seven classes of claims and interests. However, Class 1 (priority claims), Class 2 (secured claim of JP Morgan Chase) and Class 3 (secured claim of Arapahoe County) are not impaired or were already paid in full prior to the Confirmation Hearing. Thus, the heart of the Bank's classification scheme is Classes 4–7. Class 4 consists of the "allowed unsecured claims" of the GL3B Entities and is listed as unimpaired. The Bank Claim is the only claim in Class 5 and is impaired. Class 6 mirrors the administrative convenience class of Debtor's Fourth Plan and uses the same definition. Class 6 was identified as unimpaired since the Bank proposed to pay Class 6 administrative convenience creditors in full. Class 7 consisted of the "Equity Interest of the Debtor in his assets that are property of the Estate" which gets nothing. So, the key to the Bank's Plan is classifying the claims of the Bank separately from the GL3B Partnership Claim, the GL3B Trust II Claim and the Sherman & Howard Claim.

After paying Sherman & Howard its $10,000 claim in full, the Bank proposed to receive almost all of the Debtor's remaining $2.2 million in escrowed cash. But what happens to the GL3B Partnership and GL3B Trust II? Even though the GL3B Partnership Claim ($4,006,176) and the GL3B Trust II Claim ($597,074) unequivocally have been allowed as general unsecured claims, the Bank (without formal subordination) proposes to pay the GL3B Partnership and GL3B Trust II—

nothing. Somehow characterizing the GL3B Claims as unimpaired, the Bank proposes satisfaction by a fictional accounting gimmick: an "offset of Debtor's GL3B Capital Account."

### 2. *Voting and Objections to the Bank's Plan.*

The Bank solicited votes for the Bank's Plan. The voting was complicated given the proposed classifications and "impairment" characterizations. The Bank reported the following in its Ballot Summary with respect to the relevant classes:

- Class 4 (GL3B Partnership Claim and GL3B Trust II Claim):

 Both the GL3B Partnership and the GL3B Trust II (the only creditors in Class 4) voted to reject the Bank's Plan. However, the Bank asserts that the votes of the GL3B Entities should not be counted at all because the Bank contends that Class 4 is unimpaired. Section 1126(f) provides that the holders of unimpaired claims "are conclusively presumed to have accepted the plan."

- Class 5 (Bank Claim):

 The Bank, as the only member of Class 5, voted to accept the Bank's Plan. However, Class 5 had an intruder. Notwithstanding that the Bank created Class 5 solely for itself, Sherman & Howard somehow purported to join Class 5 and voted to reject the Bank's Plan.

- Class 6 (administrative convenience claims):

 The Bank received no ballots for Class 6. But, the Bank asserts that Sherman & Howard mistakenly misvoted in Class 5 and should be in

Class 6. According to the Bank, since the Bank's Plan proposed to pay all Class 6 administrative convenience claims in full, no Class 6 votes need be counted pursuant to Section 1126(f).

In addition to voting to reject the Bank's Plan, the GL3B Entities also objected to the Bank's Plan on the basis of alleged non-compliance with 11 U.S.C. §§ 1129(a)(10) and (b)(1) and well as numerous arguments rejecting the Bank's proposed offset mechanism. The offset objections appeared to be directed toward feasibility. The Debtor also objected to the Bank's Plan asserting non-compliance with 11 U.S.C. §§ 1129(a)(1), (3), (4), (5), (9), and (10) and a host of other problems.

### 3. *The Bank's Plan Cannot Be Confirmed.*[27]

a. *The Bank's Proposed Offset Treatment of the GL3B Claims Misapprehends the Partnership Agreement and Would Result in Class 4 Receiving Nothing.*

The Bank's reorganization effort fundamentally fails to appreciate that, at this juncture, the GL3B Claims are allowed unsecured claims on a *pari passu* basis with the Bank Claim. Both this Court and the United States Bankruptcy Appellate Panel for the Tenth Circuit have confirmed that the GL3B Entities are owed an aggregate of $4,603,250. The Bank has never sought to subordinate either the GL3B Partnership Claim or the GL3B Trust II Claim under Section 510(c) or otherwise. So they stand.

But rather than pay the GL3B Claims in the same fashion as other general unsecured claims (like the Bank Claim) in cash,

---

**27.** Given the Court's disposition of the Bank's Plan below, the Court need not, and does not, address all of the numerous objections to the Bank's Plan raised by the Debtor and the GL3B Entities.

the Bank's Plan proposes a fiction and states:

On the Effective Date, the entirety of the GL3B Trust II Allowed Claim shall be satisfied in full by offset of the Debtor's GL3B Capital Account in the amount of $597,074. This will leave the Debtor's GL3B Capital Account, after offset, in the amount of $3,026,404. On the Effective Date, the entirety of the GL3B Allowed Claim will be satisfied in full by offset of the $3,026,404 remaining in Debtor's GL3B Capital Account. Because Debtor is 52.616% owner of the Partnership, 52.616% of each offset will be deposited back into Debtor's Capital Account for use in additional offsets to GL3B Partners [which will offset and deposited an additional 25 times][28] . . . . After the offset of the Debtor's GL3B Capital Account to satisfy the GL3B Trust II Allowed Claim and the GL3B Partners Allowed Claim, $1,128,118 would remain in the Debtor's GL3B Capital Account on the Effective Date.

(Bank's Exhibit 33 at 10.)

The problems with the Bank's proposal are myriad. First, the Bank has not demonstrated that it has any ability to cause the GL3B Partnership (which itself is not the Debtor in bankruptcy) to do anything, much less a complicated series of offsets. The Bank introduced no evidence on this critical issue that strikes at the heart of feasibility. Second, the Bank's methodology appears to be based on a false supposition that the Debtor's capital account for the GL3B Partnership is something akin to a bank account or cash.

The Bank's Senior Vice President for Credit Resolution, Gerard Gilmore, testified on this issue both in a deposition and at the Confirmation Hearing. When he was deposed, Mr. Gilmore asserted that the basis of the Bank's Plan was that the Debtor's capital account for GL3B Partnership had cash. He changed his tune at the Confirmation Hearing. Mr. Gilmore admitted that he now believes that the Debtor's capital account actually has no cash. (This also was confirmed by the Debtor and his brother, Mark Autterson, a certified public accountant.)

Third, the Bank failed to prove that the proposed offsets technique is permissible under the Partnership Agreement or otherwise. No doubt, Mr. Gilmore asserted multiple times that Class 4 would be satisfied by a mysterious "offset against the value of the partnership interest." But, beyond repetition of this mantra, he was not able to offer any evidence demonstrating the validity of the Bank's proposed approach. His testimony on the key offsets feature of the Bank's Plan sounded like speculative guesswork. According to Mr. Gilmore, the proposed offsets would not result in any reallocation of partner interests and neither the GL3B Partnership nor the GL3B Trust II would receive any increases in their own capital accounts for the GL3B Partnership by virtue of the offsets. Mr. Gilmore stated that none of the GL3B Partnership's assets would be transferred. And then there was this gem: Mr. Gilmore did not know whether the Debtor's 52.616% general and limited partner interest in the GL3B Partnership would exist at the end of all the proposed offsets. The Court finds that Mr. Gilmore was unable coherently to explain the proposed offsets process in the Bank's Plan. In fact, his testimony seemed so ill-informed and border-line nonsensical that the Court gives it little weight.

---

**28.** *See* Bank's Exhibit 33 at 12–13 (including various offset charts for implementation of the Bank's Plan).

In argument, the Bank focused on Section 15.8 of the Partnership Agreement as the purported basis for the proposed offsets in the Bank's Plan. Section 15.8 states merely:

> If any Partner otherwise entitled to a distribution from the Partnership owes any amount to the Partnership or any other Partner pursuant to this Agreement ..., the General Partner may offset and reduce all or any part of such distribution to pay all or any part of such amount owed by such Partner.

This provision makes no reference whatsoever to capital accounts or using capital account financial entries as a mechanism to satisfy the GL3B Partnership's claims against a partner. Instead, the import is fairly straightforward. Section 15.8 of the Partnership Agreement means only that if the GL3B Partnership intends to make a distribution to its partners, then the GL3B Partnership (acting through its general partner) may "offset or reduce" the amount of a partner's distribution by the amount of any debt that the partner owes to the GL3B Partnership.

To illustrate by a hypothetical example, suppose that the GL3B Partnership liquidated certain assets and elected to distribute $10,000,000 in cash to its partners. Suppose further, that the Debtor owed the GL3B Partnership $2,000,000 prior to the proposed distribution. Under this scenario (and assuming no bankruptcy), the GL3B Partnership typically would proceed as follows based upon the current partner interests: [29]

> *First*, since the Debtor owns a 1% general partner interest and a 51.616% limited partner interest, the Debtor generally would be entitled to a $5,261,600 portion of the $10,000,000 distribution. But, since the Debtor owes the GL3B

Partnership $2,000,000, the Debtor's distribution would be "offset or reduced" by $2,000,000 resulting in a net distribution to the Debtor of $3,261,600 (and extinguishment of the $2,000,000 debt to the GL3B Partnership).

> *Second*, since the GL3B Trust I owns a 19.251% limited partner interest, the GL3B Trust I would be entitled to a $1,925,100 portion of the $10,000,000 distribution. Assuming that the GL3B Trust I was not itself indebted to the GL3B Partnership, no further "offset or reduction" would be made.

> *Third*, since the GL3B Trust II owns a 1.5% general partner interest and a 26.533% limited partner interest, the GL3B Trust II would be entitled to a $2,803,300 portion of the $10,000,000 distribution. Assuming that the GL3B Trust II was not itself indebted to the GL3B Partnership, no further "offset or reduction" would be made.

That is how the plain text of Section 15.8 of the Partnership Agreement works. The Bank offered no evidence to the contrary.

The Bank simply misconstrues Section 15.8 of the Partnership Agreement in proposing the capital account offsets procedure to satisfy the Class 4 GL3B Claims. At the end, the Bank's Plan results in the following:

- The GL3B Entities will not receive any cash.
- The GL3B Entities will not receive any distributions from the sale of GL3B Partnership assets.
- The GL3B Entities will not receive any increase in their own capital accounts, if any.
- The GL3B Entities will not receive any increase in their own partner

[29]. As noted previously, the current GL3B Partnership partner interests appear to total only 99.9%, not 100%. Thus, there is a slight discrepancy in the math.

interests in the GL3B Partnership, if any.

In short, the Bank proved that the GL3B Claims will be paid exactly—nothing.[30]

b. *The Bank's Proposed Treatment of the GL3B Claims Violates Numerous Provisions of the Bankruptcy Code.*

### 1. *Class 4 Is Impaired.*

 How the Bank could possibly characterize Class 4 as unimpaired is baffling; but the Bank's Plan purports to do so and thereby not to count votes from the GL3B Entities. Section 1124(1) provides that "a class of claims ... is impaired under a plan unless, with respect to each claim ..., the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim...." Put another way, "a class is impaired when the legal, equitable and contractual rights out of which [a creditor's] claim arises are altered in *any* way." *In re G.L. Bryan Inv., Inc.,* 340 B.R. 386, 390 (Bankr.D.Colo.2006), quoting (*In re Dean,* 166 B.R. 949, 954, fn. 3 (Bankr.D.N.M.1994)). In this case, the legal, equitable, and contractual rights of the GL3B Entities are dramatically altered by the Bank's Plan. Instead of their entitlement to payment in cash on the GL3B Claims, the Bank's Plan proposes that the GL3B Entities receive nothing. Clearly, Class 4 is impaired, rather severely at that. Thus, the Bank's Plan is unconfirmable under Sections 1124, 1129(a)(1) and 1129(a)(2).

### 2. *The Bank's Plan Unfairly Discriminates and Is Not Fair and Equitable.*

██ By characterizing Class 4 (and all other classes except Class 5) as unimpaired, the Bank's Plan purports to ignore votes from the GL3B Entities and Sherman & Howard. *See* 11 U.S.C. § 1126(f) ("a class that is not impaired under a plan, and each holder of a claim ... of such class, are conclusively presumed to have accepted the plan."). Instead, the Bank relies on the fiction that only its vote counts for the Bank's Plan. The Bank's position is untenable.

Since Class 4 is impaired, and since the GL3B Entities both have voted to reject the Bank's Plan, the Bank must meet the cramdown requirements of Section 1129(b)(1) including proving that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims ... that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1); *see also Riviera Drilling,* 2012 WL 6719591.

In this case, the Bank's Plan results in patent discrimination as between Class 4 and Class 5. The unsecured Class 4 GL3B Claims will receive nothing. Whereas the Class 5 Bank Claim will receive virtually all of the Debtor's escrowed cash and end the process with a very high, or possibly full, recovery. The Bank has offered no evidence justifying any reasonable basis for such discrimination. Since the Bank has never pursued subordination, the GL3B Claims and the Bank Claim are all allowed unsecured claims of the same character and should be treated *pari passu* in the distribution process. Further, if the votes of the GL3B Entities count (as they should), then the Bank would be unable to confirm and consummate a plan. As a result, the Bank's Plan is unconfirmable under Section 1129(b)(1).

---

**30.** The evidence also established that the GL3B Entities were not themselves materially indebted to the Debtor for purposes of offset.

### 3. *The Bank's Plan Is Not Feasibile.*

Section 1123(a)(5) mandates that every reorganization plan "shall provide adequate means for the plan's implementation." To be confirmed, "a Chapter 11 plan must be feasible." *Gentry,* 807 F.3d at 1225. In other words, it must offer "a reasonable prospect of success and be workable." *Rocky Mountain Land,* 2014 WL 1338292 at *11. The central feature of the Bank's Plan is the series of offsets supposedly resulting in the satisfaction of the GL3B Partnership Claim and the GL3B Trust II Claim. As set forth above, the Bank's offsets proposal is based on a legal fallacy. The Bank failed to prove that either it or any liquidating trustee could effect the proposed offsets in the GL3B Partnership, which itself is not in bankruptcy. In any event, the Partnership Agreement does not provide for the type of offsets suggested by the Bank. Since neither the Bank nor a liquidating trustee could perform the offsets that it proposes, it follows that the Bank's Plan is not feasible and not confirmable under Sections 1123(a)(5), 1129(a)(1), (2) and (11).

### c. *The Bank's Plan Suffers from Class 6 Infirmities.*

The Bank's Plan creates a Class 6 for administrative convenience claims and then proposes to pay allowed Class 6 claims in full. Unlike the Debtor's Fourth Plan, the Bank's Plan does not artificially impair Class 6 and then use it to create the only impaired accepting class. But, since the Bank appears to have copied the definition of Class 6 from prior iterations of the Debtor's Fourth Plan, the Bank's Plan also suffers (perhaps inadvertently) from some of the same problems.

The Bank defines Class 6 as: "Allowed Unsecured Claims that are in an amount less than $10,000 or, if greater than $10,000, where the holder of any such claim elects to reduce the claim to $10,000." Apparently unbeknownst to the Bank until recently, the Debtor already paid all small claims except the $10,000 Sherman & Howard Claim. But, as with the Debtor's Fourth Plan, the Sherman & Howard Claim does not fall within the technical rubric of Class 6 of the Bank's Plan either. Again, that is because the Sherman & Howard Claim is not less than $10,000 and it is not greater than $10,000. It is something else that does not fall into the Class 6 definition: a claim of exactly $10,000. And further, the Bank's Plan does not have any other class into which the Sherman & Howard Claim fits. As defined by the Bank, Class 4 is only for the GL3B Claims; while Class 5 is only for the Bank.

Sherman & Howard initially tried to vote in Class 5 (probably because if the Sherman & Howard Claim was considered as part of Class 5, then Class 5 would have failed to have accepted the Bank's Plan under Section 1126(c)). Of course, the Bank objected to Sherman & Howard voting in Class 5. Subsequently, Sherman & Howard conceded that it did not belong in Class 5. But again, neither does it belong in Class 6. So the Bank's Plan has a self-defeating technical glitch.

Even without the technical definition problem, the Bank's Plan still suffers from having an improper administrative convenience class. While the Bank may not have known that the Debtor improperly paid all of the Debtor's small creditors (except Sherman & Howard) post-petition, the Bank nevertheless has ended up creating an administrative convenience class for only one purported creditor: Sherman & Howard. In the end, Class 6 simply is not "reasonable and necessary for administrative convenience" within the meaning of Section 1122(b). *See National/Northway,* 279 B.R. at 23; *Rocky Mountain Land,*

2014 WL 1338292 at *15. So the Bank's Plan cannot be confirmed under Sections 1129(a)(1) and (2).

As the Bank's Plan is written, the issue cannot be easily remedied since the Sherman & Howard Claim does not fall in Class 4 or Class 5 either. Even if the Class 4 and Class 5 definitions were broader, inserting Sherman & Howard into Class 4 would be impossible since the Sherman & Howard Claim could not conceivably be satisfied by the offsets proposal. And if Sherman & Howard could join the Bank as part of Class 5, that would make the Bank's Plan unconfirmable under Sections 1126(c) and 1129(10).

### D. *Conversion, Dismissal or Appointment of Chapter 11 Trustee.*

So, having determined that neither the Debtor's Fourth Plan nor the Bank's Plan can be confirmed under the Bankruptcy Code the obvious question is: what next? [31]

The Bank filed the Amended Motion to Convert requesting three alternative types of relief: conversion from Chapter 11 to Chapter 7, dismissal, or appointment of a Chapter 11 Trustee. In final argument, the Bank requested dismissal as its preferred remedy. Both the Debtor and the GL3B Entities opposed the Amended Motion to Convert (including all the types of proposed relief). However, both the Debtor and the GL3B Entities have expressed their preference for conversion to Chapter 7 as the most appropriate remedy [32] if the Debtor's Fourth Plan is not confirmed. [33] The United States Trustee has not weighed in on the Amended Motion to Convert or proposed remedies.

The Debtor filed this case more than two years ago. After numerous plans of reorganization, none has been confirmed. Based upon a thorough review of the history of the proceedings, the docket, and the evidence at the Confirmation Hearing, the Court has determined that this Chapter 11 case is at a complete impasse. Without a consensual reorganization plan (that is, some compromise and agreement between the Debtor, the GL3B Entities, Sherman & Howard, and the Bank), it is highly unlikely, perhaps impossible, for any reorganization plan to be confirmed. The rather unique structural alignment of the parties and the amounts of their respective claims and interests dictates that each side can effectively block the other. And, if one thing is fairly clear from the public record, it is a lack of real compromise. There is not even a hint that a consensual reorganization is anywhere on the horizon. Under these circumstances, the Court determines that keeping this case in Chapter 11 makes no sense and would be detrimental to the interests of the Debtor and the remaining creditors. Appointment of a Chapter 11 trustee would not change the calculus. In fact, a trustee would be positioned to take on almost a fool's errand since the reorganization objective likely cannot be achieved with the present alignment of the warring factions. Staying in Chapter 11 indefinitely would not be in the interests of creditors. *See* 11 U.S.C. § 1104(a). The Court further notes that at the Confirmation Hearing, neither the Bank, the Debtor, nor the GL3B Entities advocated for appointment of a Chapter 11

---

**31.** The Court need not choose between the Debtor's Fourth Plan and the Bank's Plan under Section 1129(c) because both are not confirmable.

**32.** However, while expressing a preference in relation to the Amended Motion to Convert,

the Debtor has never separately requested conversion under Section 1112(a).

**33.** Neither the Debtor nor the GL3B Entities suggested that the case should remain in Chapter 11 limbo if the Debtor's Fourth Plan is not confirmed.

trustee. Applying the facts and law, and in the exercise of its discretion, the Court declines to appoint a Chapter 11 trustee under Section 1104(a).

That leaves possible conversion to Chapter 7 liquidation or dismissal. Section 1112(b) provides the statutory framework and states:

> ... on a request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter [Chapter 11] to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

The Bank requested either conversion or dismissal in the Amended Motion to Convert. The Debtor and the GL3B Entities had notice and objected. By agreement of the parties and Court Order, the Amended Motion to Convert was joined as part of the Confirmation Hearing. And the Court has decided that the appointment of a Chapter 11 trustee is not warranted. So, now there are only two remaining questions: (1) does cause exist to convert or dismiss? and (2) if cause exists, which remedy, conversion to Chapter 7 or dismissal, is in the best interests of creditors and the estate?

■ Cause under Section 1112(b)(1) is "a flexible" concept. *In re Pac. Rim Invs., LLP*, 243 B.R. 768, 772 (D.Colo.2000). Section 1112(b)(4) identifies 16 examples of cause; but the list is illustrative, not exhaustive. *See Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir.1989) (Section 1112(b) list is "not exhaustive"); *In re TCR Denver, LLC*, 338 B.R. 494, 500 (Bankr.D.Colo. 2006). The Court has broad discretion under Section 1112(b).

■ In this case, cause for conversion to Chapter 7 or dismissal exists since the Debtor has failed, during two years of bankruptcy proceedings, to confirm a plan of reorganization—and no successful reorganization appears likely in any reasonable timeframe. Appellate precedent confirms that:

> Dismissal under § 1112(b)(2) is appropriate where the debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason.

*Hall*, 887 F.2d at 1044; *see also Muth v. Muth (In re Muth)*, 514 B.R. 719 (10th Cir. BAP 2014) (table opin) (same). In this case, the Debtor failed to present any evidence that any reorganization plan is likely to succeed. As noted previously, the structural alignment of the claims against the Debtor and the history of this case demonstrate that confirmation is exceedingly unlikely. Further, at the Confirmation Hearing, the Debtor appeared to concede that if the Debtor's Fourth Plan was not confirmed, then the case should be converted to Chapter 7 liquidation. Thus, the Court finds sufficient cause (within the meaning of Section 1112(b)) to warrant conversion to Chapter 7 or dismissal.

■ The final issue is to determine which remedy—conversion to Chapter 7 or dismissal—is in the "best interests of creditors and the estate." Ultimately, this decision requires the exercise of discretion based upon the totality of the circumstances of the case. The Court starts with the positions of the parties. *See Arkansas, Inc. v. United States Trustee (In re Camden Ordnance Mfg. Co. of Arkansas, Inc.)*, 245 B.R. 794, 802 (E.D.Pa.2000) ("the creditors are the best judge of their own best interests"). At the conclusion of

the Confirmation Hearing, the Bank argued for dismissal. However, the Bank's position is somewhat inconsistent since Gerard Gilmore, the Bank's Senior Vice President for Credit Resolution, testified that he thought conversion to Chapter 7 would be in the Bank's best interest. Meanwhile, the Debtor and the GL3B Entities took a more consistent and unified approach favoring conversion to Chapter 7 (if the Debtor's Fourth Plan was not confirmed). Neither Sherman & Howard nor the United States Trustee weighed in.

■■■■ Thus, the creditor tally yields somewhat mixed results. The majority of creditors (by both dollar amount and number) favor conversion to Chapter 7 (*i.e.*, the GL3B Partnership Claim is $4,006,176 and the GL3B Trust II Claim is $597,074 while the Bank Claim is only $2,629,160). However, the GL3B Partnership is clearly an insider of the Debtor under Section 101(31)(A) since the Debtor is a general partner, majority limited partner, and managing partner of the entity. The Debtor effectively controls both the GL3B Partnership and the GL3B Trust II. The insider nature of these claims must be acknowledged. In the analogous plan confirmation context, acceptance by impaired classes is "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). In the context of this case, the Court determines that the position of the GL3B Entities on the conversion or dismissal issue should be, at a minimum, greatly discounted as compared to a non-insider creditor such as the Bank. In any event, creditor views are not dispositive. The process is not one of "merely tallying the votes of the unsecured creditors and yielding to the majority interest."

*Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.),* 14 F.3d 240, 243 (4th Cir.1994). Instead, the Court needs to exercise judgment.

The Court gives substantial weight to the bad faith conduct of the Debtor both before and during the bankruptcy case. *See Muth,* 514 B.R. 719, 2014 WL 1712527 at *5 (quoting *In re First Assured Warranty Corp.,* 383 B.R. 502, 543 (Bankr. D.Colo.2008)) ("Although a debtor's bad faith in filing a petition is not an enumerated ground for dismissal under § 1112(b), courts have overwhelmingly held that proof of such allegations may be 'cause' for dismissal"). The Debtor's decision to amend the Partnership Agreement the day after the Bank Judgment and a few days before the bankruptcy petition taints the entire character of the bankruptcy case (whether in Chapter 11 or Chapter 7). And, the Debtor also inflated the GL3B Claims immediately before the bankruptcy filing to seek unfair advantage. The Court reiterates again that this case merely is a dispute between the Bank and the Debtor (and his related GL3B Entities which have supported his every move). *See In re Platte River Bottom, LLC,* 2016 WL 241464 at *12 (Bankr.D.Colo., Jan. 20, 2016) (choosing dismissal rather than conversion from Chapter 11 to Chapter 7 because case was really a "two-party dispute"). There are no other true arm's length unsecured creditors.[34] The parties already have engaged in extensive investigation and discovery. Accordingly, the *raison d'etre* for a Chapter 7 trustee (*i.e.,* to administer assets, to investigate the Debtor's financial affairs, and to pay creditors) really does not come into play in a typical fashion. All of the parties already

---

**34.** Sherman & Howard has a fairly small unsecured claim of $10,000. However, even if the law firm does not qualify as an insider of the Debtor, at a minimum, the law firm is closely aligned with the Debtor since the law firm represented and continues to represent the Debtor and the GL3B Entities.

are represented. The Debtor, the GL3B Entities, and the Bank can protect their own interests without involving a Chapter 7 trustee. The investigation already has been exhaustive. So, to appoint a Chapter 7 trustee at this juncture seems quite unnecessary and duplicative. The Court also considers the potential additional expenses. Given the amount of potential distributions in this case, a Chapter 7 trustee may be entitled to substantial compensation which would reduce any recoveries. *See* 11 U.S.C. § 326.

On balance, the Court determines that the best interests of creditors and the estate would be served by dismissal rather than conversion. If the case is dismissed, all parties may pursue their non-bankruptcy remedies without further delay and obfuscation.

## VI. *Conclusion*

The parties have presented a myriad of challenging Chapter 11 issues at a critical juncture in this case. For the reasons set forth above, the Court concludes that the Debtor's Fourth Plan cannot be confirmed. Similarly, the Court concludes that the Bank's Plan also cannot be confirmed. Given the structural alignment of the claims and lack of any consensus, the Court views successful reorganization is extremely unlikely within any reasonable timeframe. As two years already have passed without a confirmed reorganization plan, cause exists to convert to Chapter 7 or dismiss. Bankruptcy no longer is a constructive venue for resolution of what is a dispute between the Bank (on the one side) and the Debtor and his related GL3B Entities (on the other side). In the exercise of the Court's discretion, the Court dismisses this case.